[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Burns*, Slip Opinion No. 2022-Ohio-4606.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4606

THE STATE OF OHIO, APPELLEE, *v*. BURNS, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Burns*, Slip Opinion No. 2022-Ohio-4606.]**

*Criminal law—Juvenile law—R.C. 2152.12—R.C. 2151.23—Juvenile court determined that act alleged in juvenile-court complaint was not supported by probable cause, and defendant was then indicted and convicted in adult court for same act—Conviction vacated on the authority of* State v. Smith*—Counts in indictment pertaining to offenses that were not charged in the juvenile-court complaint but were based on conduct included in the juvenile-court complaint were properly brought in adult court—Court of appeals' judgment affirmed in part and reversed in part and cause remanded.*

(No. 2020-1126—Submitted April 12, 2022—Decided December 23, 2022.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 108468, 2020-Ohio-3966.

_____

**STEWART, J.**

{¶ 1} In this discretionary appeal, we are asked to decide whether the state must prove in juvenile court that there is probable cause to believe that a juvenile committed every act charged before the juvenile may be indicted for those acts in adult court. In accordance with our decision in *State v. Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, ¶ 44, in which we held that "[a] finding of probable cause is a jurisdictional prerequisite under R.C. 2152.12 to transferring a child to adult court for prosecution of an act charged," we reverse the portion of the judgment of the Eighth District Court of Appeals affirming appellant Eddie Burns's conviction on Count 29 of the indictment and vacate that conviction, and we affirm the portion of its judgment affirming Burns's convictions on Counts 11, 20, 45, 46, and 55 of the indictment. *See* 2020-Ohio-3966, ¶ 67, 70, 125.

**Facts and Procedural History**

{¶ 2} On March 7, 2018, Burns, then 16 years old, was charged in a 58-count complaint in the juvenile division of the Cuyahoga County Court of Common Pleas. The charges stemmed from a series of violent, theft-related offenses committed over a period of six months, each involving different places, victims, and witnesses.

{¶ 3} The state sought to transfer Burns's case from juvenile court to the general division of the common pleas court ("adult court"). It filed motions asking that Burns be bound over to adult court on either a mandatory or a discretionary basis under R.C. 2152.12. The juvenile court held a hearing on the state's motion to transfer jurisdiction, and it thereafter found that the state had established probable cause to believe that Burns had committed the acts related to 42 of the 58 counts. The juvenile court also found that Burns was not subject to mandatory bindover. It then ordered an investigation into Burns's background and a psychological evaluation of him to determine whether he was amenable to rehabilitation in the juvenile justice system. *See* R.C. 2152.12(C).

**{¶ 4}** The juvenile court held an amenability hearing, after which it found that there were reasonable grounds to believe that Burns was not amenable to care or rehabilitation in the juvenile justice system and that the safety of the community required that Burns be subject to adult sanctions. The court therefore granted the state's motion for discretionary bindover and transferred the case to adult court.

**{¶ 5}** A Cuyahoga County grand jury returned a 56-count indictment against Burns that was similar to the 58-count complaint that was filed in juvenile court. Burns initially pleaded not guilty to all the charges in the indictment. But approximately four months later, Burns and the state reached a plea agreement and Burns pleaded guilty to ten of the charges in the indictment, as amended. The trial court accepted Burns's guilty plea, found him guilty, and sentenced him to a total of 27 years in prison.

**{¶ 6}** Burns appealed his convictions and sentence to the Eighth District, asserting, among other assignments of error, that "[t]he state violated [his] statutory and constitutional rights when it criminally indicted him on counts that were never transferred to adult court, due to the state's failure to establish probable cause." After finding that Counts 29 and 55 of the indictment were the only counts that Burns pleaded guilty to that corresponded to counts charged in the juvenile-court complaint, the court of appeals found no merit to Burns's argument. 2020-Ohio-3966 at ¶ 45, 72. Relying on its decision in *State v. Frazier*, 8th Dist. Cuyahoga Nos. 106772 and 106773, 2019-Ohio-1433, *abrogated by Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, in which the court of appeals held that an adult court has jurisdiction over all the counts transferred to it by a juvenile court under R.C. 2152.12(I), even counts for which the juvenile court found no probable cause, when all the acts underlying the counts were committed during the same course of conduct, *Frazier* at ¶ 45-47, the court of appeals overruled Burns's assignment of error, 2020-Ohio-3966 at ¶ 56-67, 72. Burns also argued that some of the juvenile court's probable-cause findings were not supported by sufficient

evidence, but the court of appeals rejected that argument as well, holding that there was sufficient credible evidence to support the juvenile court's probable-cause findings as to each charge. *Id.* at ¶ 91-119.

{¶ 7} Burns filed a discretionary appeal to this court, and we accepted the following proposition of law for review:

> Because prosecutors must present credible evidence of every element of every offense charged, prosecutors may not criminally indict children on counts for which they failed to establish probable cause in juvenile court. For the same reason, a court errs when it decides that probable cause on lesser included offenses equals probable cause for greater predicate ones.

*See* 160 Ohio St.3d 1494, 2020-Ohio-5634, 159 N.E.3d 278. Following oral argument, we sua sponte ordered the parties to file supplemental briefs as to the impact of our holding in *Smith* on the proposition of law. 165 Ohio St.3d 1538, 2022-Ohio-392, 180 N.E.3d 1164.

**Law and Analysis**

{¶ 8} In *Smith*, this court addressed the question of "what specifically transfers when a juvenile court exercises its discretion and binds over a juvenile * * * to an adult court pursuant to R.C. 2152.12." *Id.* at ¶ 24. After considering the statutory language and framework of R.C. 2152.12, which governs the transfer of cases from juvenile court to adult court, and the history of the juvenile-bindover procedure and the practical and constitutional constraints on that process, we held that a juvenile court must first find that there is probable cause to believe that the child committed the act charged before that act can be transferred to adult court. *Smith* at ¶ 26. We also concluded that an adult court lacks subject-matter jurisdiction to convict a juvenile offender for any act charged for which no probable

4

cause was found by the juvenile court. *Id*. at ¶ 44.

{¶ 9} Two of the charges in the indictment, Counts 29 and 55, were the same as two of the charges in the juvenile complaint. Burns argues that the adult court lacked subject-matter jurisdiction over Counts 29 and 55 of the indictment because the juvenile court did not find probable cause to believe that Burns had committed the acts alleged in those counts. Specifically, Count 29 charged Burns with aggravated robbery for acts committed on or about January 21, 2018 (with one-year and three-year firearm specifications), and Count 55 charged him with receiving stolen property for acts committed on or about February 7, 2018.

{¶ 10} We agree with Burns that the juvenile court determined that the act alleged in Count 29 was not supported by probable cause. Count 55 of the indictment, however, mirrored Count 57 of the juvenile complaint, and the juvenile court had determined that probable cause supported that count. So on the authority of *Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, we reverse the portion of the judgment of the court of appeals affirming Burns's conviction on Count 29 and vacate his conviction on that count. As to Count 55, however, we affirm the court of appeals' judgment.

{¶ 11} Burns also asserts that our holding in *Smith* is dispositive as to Counts 45 and 46 of the indictment (charging Burns with the attempted murders of Willie and Della Watts, respectively, on or about February 7, 2018) because those charges were not brought in juvenile court. Burns argues that since the juvenile court never found probable cause regarding those counts, the adult court lacked jurisdiction over the counts and his convictions on them should be vacated.

{¶ 12} The state, however, argues that an adult court is not limited to considering the specific acts charged in juvenile court and that imposing such a constraint would be inconsistent with the text of R.C. 2151.23(H), which governs the jurisdiction of a juvenile court. We agree that an adult court is not necessarily limited to considering only the specific acts bound over from the juvenile court.

After a case has been transferred from a juvenile court to an adult court, the adult court "has jurisdiction subsequent to the transfer to hear and determine the case in the same manner as if the case originally had been commenced in that court * * *." R.C. 2151.23(H). In *Smith*, we explained that the "the case" before the adult court is composed of the acts that were transferred to that court. *Id.* at ¶ 28.

{¶ 13} We acknowledge that generally, a grand jury is empowered to return an indictment on any charges supported by the facts submitted to it. *See State v. Adams*, 69 Ohio St.2d 120, 431 N.E.2d 326 (1982), paragraph two of the syllabus, *superseded by statute on other grounds as stated in State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894. But a grand jury may not consider additional charges arising from a different course of conduct or events that have not been properly bound over by the juvenile court. *State v. Weaver*, 6th Dist. Lucas No. L-18-1078, 2019-Ohio-2477, ¶ 14 (citing cases from several Ohio appellate districts). This means that a case transferred from a juvenile court may result in new indicted charges in the adult court when the new charges are rooted in the acts that were the subject of the juvenile complaint but were not specifically named in the individual acts transferred. *Id.*; *Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, at ¶ 35. Here, Counts 45 and 46 pertained to attempted-murder offenses that were not charged in the juvenile-court complaint; they were charged in the grand-jury indictment and were based on conduct that occurred on or about February 7, 2018—conduct that was in the juvenile complaint against Burns. *See Smith* at ¶ 35; *see also* R.C. 2151.23(H). Accordingly, we affirm the portion of the court of appeals' judgment affirming Burns's convictions on Counts 45 and 46.

{¶ 14} Finally, Burns argues that "a court errs when it decides that probable cause on lesser offenses equals probable cause for greater predicate ones" and that this court should therefore vacate his convictions on Count 11 (aggravated robbery for acts committed on or about December 28, 2017, with a one-year firearm specification) and Count 20 (aggravated robbery for acts committed on or about

January 8, 2018, with one-year and three-year firearm specifications) of the indictment. Burns argues that "this Court should make clear that probable cause for lesser non-included offenses like receiving stolen property do not ipso facto prove a child was complicit in the underlying theft or robbery of that property" and that "because this Court has held that prosecutors must present credible evidence of every element of an offense per R.C. 2152.12, they must support every element of a principal offense that a child has allegedly aided or abetted." Neither Burns nor the state, however, asserts that our decision in *Smith* is dispositive of this argument, and Burns does not frame his challenge regarding the sufficiency of the evidence supporting the juvenile court's probable-cause findings as affecting the adult court's jurisdiction. Accordingly, because the juvenile court found probable cause regarding those charges before they were transferred, we hold that the adult court had jurisdiction over the charges. We therefore affirm the portion of the judgment of the court of appeals affirming Burns's convictions on Counts 11 and 20 of the indictment.

### Conclusion

{¶ 15} For the foregoing reasons, we affirm the portion of the judgment of the Eighth District Court of Appeals affirming Burns's convictions on Counts 11, 20, 45, 46, and 55 of the indictment. Based on our holding in *Smith*, we reverse the portion of its judgment affirming Burns's conviction on Count 29 of the indictment, vacate that conviction, and remand the cause to the trial court for further proceedings consistent with this opinion.

Judgment affirmed in part<br>
and reversed in part<br>
and cause remanded.

O'CONNOR, C.J., and DONNELLY and BRUNNER, JJ., concur.

KENNEDY, J., concurs in part and dissents in part, with an opinion joined by FISCHER and DEWINE, JJ.

_____

**KENNEDY J., concurring in part and dissenting in part.**

{¶ 16} I concur in the majority's affirmance of the judgment of the Eighth District Court of Appeals as to Count 55 of the indictment because the juvenile court found probable cause to believe that appellant, Eddie Burns, had committed the offense alleged in that count. I also concur in the majority's affirmance of the court of appeals' judgment as to Counts 45 and 46 of the indictment based on the application of R.C. 2151.23(H). However, I part ways with the majority in its decisions to reverse the court of appeals' judgment affirming Burns's conviction on Count 29 of the indictment on the authority of *State v. Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, and to vacate that conviction.

{¶ 17} The majority in *Smith* misconstrued R.C. 2152.12, playing word games with the unambiguous language of the statute to achieve a particular result: that only each "act charged" for which the juvenile court has found probable cause transfers to the adult court. *Smith* at ¶ 2. The majority in *Smith* held that if the juvenile court specifically finds no probable cause regarding a particular "act charged" in the juvenile complaint, that same offense cannot be charged in the indictment in adult court. *Id*. at ¶ 44.

{¶ 18} In my view, however, based on the plain and unambiguous language of R.C. 2152.12, when the juvenile court granted the state's discretionary motion to transfer the case to the adult court, the adult court had jurisdiction over the case, including the acts charged in the juvenile complaint, regardless of whether the juvenile court had found probable cause for those counts. R.C. 2151.23(H) provides that on transfer, the adult court had jurisdiction to "hear and determine" the case as if the case had originated in the adult court.

{¶ 19} Therefore, I concur in part and dissent in part.

{¶ 20} Before I explain why the majority is wrong to reverse the court of appeals' judgment affirming Burns's conviction on Count 29 of the indictment and

to vacate that conviction on the authority of *Smith*, the facts of this case should be fully developed. The majority summarizes the 56-count indictment as "charges [that] stemmed from a series of violent, theft-related offenses committed over a period of six months." Majority opinion, ¶ 2. But because of its lack of detail, the majority's summation of what Burns did is disingenuous. His charges originate from the savage beatings and robberies of vulnerable, elderly victims and the robberies of other people at gunpoint. The 56-count indictment stems from a reign of violent lawlessness that forever changed the lives of his Cleveland and Solon victims.

## I. FACTS AND PROCEDURAL POSTURE

### A. *August 10, 2017: The punching and robbery of James Peavy*

{¶ 21} James Peavy was 77 years old on August 10, 2017, when he went to AJ's Drive Thru on St. Clair Avenue in Cleveland to withdraw money from an ATM. When the money he withdrew was dispensed, Burns punched him in his head and stole the money. After the robbery, Peavy left the store and an employee came outside to ask him what had happened.

{¶ 22} Nael Abedrabbo testified that he was working at AJ's Drive Thru on the day Peavy was robbed. He saw Peavy go to the ATM. Just as Peavy pulled the money away from the ATM, Burns, whom Abedrabbo recognized because Burns was a frequent visitor of the store, hit Peavy in the head and stole the money.

### B. *November 13, 2017: The beating and robbery of J.C. Green*

{¶ 23} On November 13, 2017, J.C. Green was 87 years old and was living at 690 East 99th Street in Cleveland. On that day, two men broke into his residence by picking a door lock and began beating him. They struck him on his head, his eyes, and all over his body. As they beat Green, the two men went through his pockets and asked for his credit cards. J.C. laid his credit cards and driver's license on a table. After the intruders left, J.C. went to a neighbor's house and called for

help. J.C. was then taken to University Hospital, where he stayed for about two weeks.

**{¶ 24}** J.C.'s son, Dwight Green, testified that J.C. went to Hanna House for rehabilitation after he was released from the hospital. J.C. had sustained blunt-force trauma to his head and eyes. One eye was so badly injured that it was "almost pushed out of its socket." The other eye was bloody. J.C.'s jaw was severely bruised, and his chin was "cracked." Prior to being beaten, J.C. had good cognitive ability, mental alertness, and communication skills. Dwight testified that since J.C.'s assault by Burns and his accomplice, all J.C. does is stay in bed and "[h]e's not the same person."

*C. December 28, 2017: The armed robberies of Lacey Mathy and Eric Walls*

**{¶ 25}** Lacey Mathy worked for Cleveland Channel 19 News, and her on-air last name is "Crisp." Walls was a photographer at the same news station. Mathy testified that on December 28, 2017, she and Walls were at 663 99th Street in Cleveland for a live shot about a house fire at that location the night before. Just after 5:00 p.m., they were in a news van when they were robbed at gunpoint.

**{¶ 26}** Walls was in the driver's seat, and Mathy was in the passenger's seat. Mathy was on her phone trying to determine the location of an active fire scene when she saw three male kids running across the street in front of her from a vacant lot. At the time, she did not think much of it and went back to texting on her phone.

**{¶ 27}** A couple of minutes later, someone opened the driver-side door and Walls held up his phone and said, "[T]ake it, just take it." At that time, Mathy did not understand what was going on, because people often came up to the news van. It was not until Walls said, "Lacey give him your phones, he has a gun in my ribs," that Mathy realized that they were being robbed at gunpoint by the three males, though she only saw two of them. All three were wearing very dark clothing and ski masks or neoprene vests over their faces. Two of the robbers brandished

handguns. Even though he was wearing a mask, Mathy could see that the robber on her side of the van was a "very young African American boy" with a "squarish face" and was approximately 5'6" or 5'7."

{¶ 28} Mathy was terrified, and she witnessed Walls hand over his work phone and other property. She then saw another male coming to the passenger-side door, so she tried to lock that door with her elbow. The robber who was pointing the gun at Walls could see what Mathy was doing, so he unlocked the passenger-side door. The robber on Walls's side of the van began demanding Mathy and Walls's phones, wallets, and anything else they had. Mathy gave him her work phone and then tried to call 9-1-1 on her personal phone, but he saw what she was doing, so the robbers took that phone as well. The robber on Walls's side of the van then reached across Walls to grab his laptop bag. Walls told him that he did not have much cash. Mathy had a big red bag with her that contained things she needed throughout the day, like a change of clothes, makeup, and extra cables and cords. One of the robbers opened the passenger-side door and tried to pull the bag from underneath Mathy's feet, but her feet were tangled in the bag's handles, so she almost fell out of the van. The robber on Walls's side of the van was trying to unlock Mathy's phone, and he demanded that she enter the phone's passcode. After Mathy complied, the robber then demanded that she turn off the passcode. Mathy tried to explain that she did not know how to do that, and the robber became very angry. She then "started freaking out because [she] thought they were gonna shoot [them] because [she] didn't know how to take the password off the phone." Her personal phone was a pink iPhone 7 Plus. The robber and Mathy passed that phone back and forth until the robber was able to clear the passcode.

{¶ 29} The property that the robbers took from Mathy included her work phone, which was a black iPhone 5 in a white OtterBox case, her personal cell phone, and her wallet, which held her driver's license, debit card, credit cards, a handful of gift cards, and a small amount of cash.

{¶ 30} After the robbers left, Walls tried to call for help on a phone installed in the van. Mathy then saw a car pull into a driveway. Mathy jumped out of the van, ran to the woman who had been driving the car, and said, "[W]e were just robbed at gunpoint, I need to borrow your phone so I can call 9-1-1." The woman allowed Mathy to call 9-1-1 and Mathy's husband. Mathy's husband canceled the credit cards and began tracking Mathy's personal cell phone. Later that night when she was speaking with police, Mathy received an alert indicating that her personal cell phone had been located at the Tones Wireless shop at 79th Street and Superior Avenue in Cleveland.

{¶ 31} Detective Bruce Kirchner of the Cleveland Division of Police investigated the robbery. Detective Kirchner went to Tones Wireless and watched the shop's security video, looking for a man trying to sell a pink iPhone. He saw on the video a man attempting to sell the iPhone. Detective Kevin Warnock of the Cleveland Division of Police also investigated the robbery. When he saw the security video from Tones Wireless, he was "100 percent positive" that the person attempting to sell the iPhone was Burns. Burns was told by the shopkeeper that an alert had gone off on the phone; it was a loud alarm, and Burns left with the phone. Detective Warnock then referred to social-media platforms to aid in the investigation. Using Burns's Instagram account, Warnock was able to find pictures showing Burns wearing the same clothes that he was wearing in the video from Tones Wireless.

### D. January 8, 2018: The armed robbery of Max Rivera

{¶ 32} Max Rivera was employed by Spectrum. On January 8, 2018, he arrived at 651 East 93rd Street in Cleveland for a service call. After greeting his customer, he went back to his truck and was assaulted and robbed by two people, one of whom had a revolver. The two robbers came from the area near the back of the truck, pushed Rivera against the truck, and demanded "phones, wallets, * * * tablets, and * * * the password for those, and [his] credit card." After the robbery,

the two robbers told Rivera to leave. After leaving, Rivera followed his employer's policy and got to a safe place, called police, called his supervisor, and called his wife to have her cancel the credit and debit cards.

{¶ 33} Ameen Marzouk worked at One Stop Shop at 10109 St. Clair Avenue in Cleveland. On January 9, 2018, a detective came into the store and asked Marzouk whether he had seen anyone use the store's ATM the previous day. Marzouk reported that he had seen Burns use the ATM, leave, and then come back into the store and use the ATM a second time. Marzouk testified that Burns's use of the ATM was out of the ordinary because he had never seen Burns use a bank card at the store. He remembered that the card was green.

*E. January 21, 2018: The armed robbery of Victor Ford*

{¶ 34} Victor Ford worked for Regional Express delivering packages for Amazon.com. On January 21, 2018, he was on Longview Drive in Solon. He had oversized packages to deliver, so he pulled into the driveway at a delivery address and took one package to the door. When he was going back to his van to get another package, Ford observed a car and a minivan parked on the apron near the house. The minivan was a "grayish-blue" Dodge Journey. A slender man standing approximately 5'6" to 5'8" tall hopped out of the car holding a gun. The man was wearing a ski mask with lime-green stitching. The gun was black and looked like a 9 mm. When he saw the gun, Ford ran away to the rear of a nearby house and then watched the man jump into the work van and drive it away. The minivan and the car also then left. The robber made off with approximately 100 Amazon packages and Ford's wallet and credit cards, driver's license, car keys, and bag. The work van was recovered in Richmond Heights. Ford's credit cards were thereafter used at a Walmart, a GameStop, a Rally's, a Sunoco, and on a payment app.

{¶ 35} Andrew Hoffman testified that he owned a gray Dodge Journey that was stolen from his place of employment on January 15, 2018. It was recovered

later that month, and Hoffman went to the police department and retrieved the vehicle from the impound lot.  When he picked up the vehicle, there was damage to the exterior and the inside was filthy.  Hoffman testified there was a lot of mud and dirt on the inside of the vehicle, as well as a stack of debit cards, a pry bar, bolt cutters, wallets, and a bag (that matched the description of the bag taken from Ford).

{¶ 36} Detective Kristi Harvey of the Solon Police Department testified that she connected the unauthorized credit-card charges to the points of purchase and then sought security video from those establishments.  She was successful in retrieving video from Walmart.  Burns appeared in the video, along with Charles Burns, Quantae Lucas, and Cordell Walcott, purchasing a 55-inch television with Ford's credit card approximately two hours after Ford's work van was stolen.  They emerged from the Walmart and got into a Dodge Journey.  Detective Harvey also reviewed video of the four from two GameStop stores; at one store they purchased an Xbox.  The detective identified the same four in a surveillance still shot from the GameStop in Steelyard Commons.  Walcott was wearing a black hat with lime-green stitching.  Ford's work van was recovered at the address that Burns gave as his home address when he was arrested.

### F.  February 7, 2018: The savage beatings and robberies of
### Willie and Della Watts

{¶ 37} On February 7, 2018, Della Watts, who was then 76 years old, arrived home at 689 East 99th Street in Cleveland at 9:00 p.m.  She called her husband, Willie Watts, when she reached the driveway so he could come to the home's side door to let her in.  Della always called Willie when she reached the driveway, because he had been very sick and was weak and calling him gave him time to get to the door to let her in.  Willie had been in the hospital most of the previous November and all of December.  He had returned home on January 6, 2018.

{¶ 38} After backing her car into the garage, Della picked up a grocery bag that was holding her husband's medication, her wallet, and her purse. As she walked down the driveway, a young man approached her and said, "[D]o you know who I am?" She responded, "[N]o." The young man replied, "I help you, that big guy, shovel your driveway." Ms. Watts responded, "[N]o, you don't, * * * my son shovels my driveway and my grandson."

{¶ 39} Della testified that she was wearing a brace on her leg and walked with a cane. Burns took her cane and hit her with it on her head while asking, "[W]here's the money?" He beat her with the cane until it broke. She dropped the grocery bag and told Burns that the money was in the bag. At the time of the attack, Della was in the middle of the driveway, and after the cane broke, Burns stomped and kicked her. While Burns was kicking her, Della's leg brace became loose. She could not get up from the driveway without her cane.

{¶ 40} Willie witnessed the savage attack of Della from the house's side door. Burns saw Willie trying to get down the steps. Della testified that Willie "was trying to hold on because didn't have much strength." When Burns saw Willie trying to get down the steps, he immediately attacked him and knocked him back into the closed-in porch. Unable to get up, Della rolled down the driveway to get to her husband. Della testified that she had had her keys in her coat pocket and that Burns hit her with such force that her car alarm sounded. But the car alarm did not cause Burns to flee. Willie was too weak to fend off Burns. During the savage beating of Willie, Burns never asked him for his wallet or anything else. Della testified, "[H]e just wanted to beat us, and that's what he did. He beat us."

{¶ 41} Burns eventually took Della's wallet and began running down the driveway, but he turned around and came back when Della reached the steps. When Della reached the steps, Willie tried to help her get up, but he was too weak. Burns began kicking Della again. Burns asked Willie, "What is your bank code?" Willie told Burns that he did not know the bank code, which prompted Burns to stomp on

Della again. Willie then begged Burns to stop, saying "please don't hit her, please don't hit her no more." Willie then tried to shield his wife from the beating by laying on top of her. Della testified, "[M]y husband took the brunt of the beating." Willie shielded Della's face from additional blows, but Burns still kicked her in the head and on the side of her body. She then told Burns a fake bank code, and Burns then ran down the driveway and across the street.

{¶ 42} As Della and Willie were trying to get into the house, Della saw a police car coming down the street, so she started yelling and screaming. Once they were inside the house, Willie locked the door and Della dialed 9-1-1. By that time, Willie was going in and out of consciousness and bleeding profusely. Police responded to the couple's home within five minutes. On arrival, police immediately called for an ambulance because Willie was bleeding so badly. The ambulance took the couple to University Hospital.

{¶ 43} Willie suffered five broken facial bones, a broken nose, and a concussion. Emergency-room personnel stopped him from blowing his nose because if he did so, the broken bones in his face would have caused him to go blind. A couple of weeks after the incident, Willie died. He was 81 years old.

{¶ 44} Della suffered a gash on her forehead, two black eyes, bruising on the leg on which she wore her brace, and her stomach and back were "black and blue all over." The beating resulted in a scar on Della's head that runs from the top down to the side.

{¶ 45} During the initial conversation between Burns and Della, Burns was two feet or less away from her. The area was well lit due to lights on the inside of the Watts's garage and the side of their home. Della made an in-court identification of Burns as the attacker.

*G. February 7, 2018: Stolen Mazda CX-5*

{¶ 46} Officer Daniel McCandless of the Cleveland Division of Police was investigating the theft of a car on February 7, 2018. He first observed the vehicle

16

on East 103rd Street and St. Clair Avenue in Cleveland, when the vehicle fled from him. The license plate on the vehicle was registered to an address on East 99th Street.

{¶ 47} Officer McCandless responded to 684 East 99th Street, the address to which the license plate was registered, and the owner of the license plate did not realize that her license plate had been stolen. The vehicle that the license plate was registered to was inoperable and in the owner's driveway. Officer McCandless then asked the owner of the license plate whether she had noticed anything suspicious in her driveway, like a blue Mazda, which was the type of vehicle that fled from Officer McCandless earlier that day. She told Officer McCandless that she had not noticed anything suspicious, but about an hour later she called police dispatch and said that there was a blue Mazda in her driveway. In response, Officer McCandless and two other officers went back to 684 East 99th Street.

{¶ 48} While on East 99th Street, Officer McCandless observed a Black male running up the driveway of 684 East 99th Street. The person running was small in stature and was wearing khaki pants, tan Timberland boots, and a dark-colored jacket. As Officer McCandless pulled into the driveway of 684 East 99th Street, the person ran to his left and then to his right. As he exited his cruiser, Officer McCandless heard a house door slam shut. As he walked to the back of the house, he saw a blue Mazda bearing the same license plate as the vehicle that fled from him earlier that day. Officer McCandless then contacted the two officers assisting him, Officers O'Malley and Lanigan.

{¶ 49} Officer McCandless then knocked at the back door of 684 East 99th Street and spoke with the owner of the stolen license plate. He asked her if anyone had just run into her house. She indicated to the officer that someone had just run into her home and to the basement.

{¶ 50} Officers McCandless and Lanigan then went into the basement to conduct a search. While downstairs, Officer Lanigan noticed a male hiding in a

shower stall who matched the description of the male that Officer McCandless saw running minutes before. It was Burns. Across from where Burns was found, there was a woman's snap-close pocketbook and some credit cards and identification cards on the floor. After securing Burns, Officers McCandless and Lanigan checked the identifications and credit cards; they belonged to a Della Watts. Officer McCandless requested a check as to whether the items were stolen and was immediately advised that Della had just been robbed at the address almost directly across the street.

{¶ 51} After receiving that information, Officer McCandless went across the street and found Della and Willie "severely beaten and bloody" and "blood on the driveway and blood inside their residence in the kitchen." He immediately called for emergency medical services and began talking with Della and Willie to determine what had happened. After learning what had happened to them, Officer McCandless showed the purse he had retrieved from the basement of 684 East 99th Street to Della and asked her if it was hers. Della said that it was her purse. Officer McCandless made an in-court identification of the male he saw running on East 99th Street—Burns.

{¶ 52} The next day, Detective Robbie Durbin of the Cleveland Division of Police executed a "consent to search warrant" for the house at which Burns had been found. The owner of the house and their tenant had agreed to the search. In the basement, Durbin found a loaded .45-caliber Springfield Armory semiautomatic handgun on a sill plate.

*H. Juvenile proceedings*

{¶ 53} The state filed a 58-count complaint against Burns in the juvenile court. The juvenile court found probable cause to believe that Burns had committed the acts alleged in Counts 1, 2, 4, 6 through 23, 25 through 29, 36 through 43, 46, 47, 49 through 52, 54, and 55. The juvenile court did not find probable cause as to Counts 3, 5, 24, 30 through 35, 44, 45, 48, 53, and 56 through 58. After holding an

amenability hearing and considering the amenability factors in R.C. 2152.12(D) and (E), the juvenile court determined that Burns "[was] not amenable to care or rehabilitation within the juvenile system" and that "the safety of the community may require that the child be subject to adult sanctions." The juvenile court then transferred Burns's case to the adult court.

### I. Adult-court proceedings

{¶ 54} Burns was charged in a 56-count indictment in adult court. The adult court held a plea hearing on March 14, 2019. After the parties negotiated a plea agreement, Burns entered a plea of guilty to the following counts: Count 1, the robbery of James Peavy; Count 6, the aggravated burglary of the home of J.C. Green; Count 11, the aggravated robbery of Lacey Mathy, with a one-year firearm specification, as amended to dismiss a three-year firearm specification; Count 20, the aggravated robbery of Max Rivera, with one- and three-year firearm specifications; Count 29, the aggravated robbery of Victor Ford, with a one-year firearm specification, as amended to dismiss a three-year firearm specification; Count 35, receiving stolen property, as amended to dismiss a one-year firearm specification; Count 45, the attempted murder of Willie Watts; Count 46, the attempted murder of Della Watts; Count 47, the aggravated robbery of Della Watts; and Count 55, receiving stolen property regarding the stolen Mazda CX-5. In turn, the state dismissed Counts 2 through 5, 7 through 10, 12 through 19, 21 through 28, 30 through 34, 36 through 44, 48 through 54, and 56. The state agreed to recommend a prison sentence in the range of 12 to 30 years. The trial court imposed an aggregate prison sentence of 27 years.

{¶ 55} Because I concur in the majority opinion as to its affirmance of the court of appeals' judgment affirming Burns's convictions on Counts 45, 46, and 55 of the indictment, this opinion addresses why *Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, was wrongly decided and should be overturned and

why the majority is wrong to reverse the court of appeals' judgment affirming Burns's conviction on Count 29.

## II. LAW AND ANALYSIS

### A. *Standard of review*

{¶ 56} This court is asked to apply Ohio's statutes governing the discretionary transfer of a juvenile case to adult court. Because of this court's decision in *Smith*, the dispute here centers on the correct interpretation of those statutes. "The interpretation of a statute is a question of law that [this court] reviews de novo." *Stewart v. Vivian*, 151 Ohio St.3d 574, 2017-Ohio-7526, 91 N.E.3d 716, ¶ 23.

### B. Smith *was wrongly decided and should be overturned*

{¶ 57} The majority in *Smith* interpreted R.C. 2152.12 as affecting the subject-matter jurisdiction of an adult court. *See Smith* at ¶ 41-43. It held that under R.C. 2152.12, following transfer from a juvenile court, the adult court has subject-matter jurisdiction over only those "acts charged" for which the juvenile court had found probable cause to believe that the juvenile committed the acts. *Smith* at ¶ 26, 29, 42. That is, only an individual "act charged" for which the juvenile court found probable cause transfers to the adult court. *Id.* at ¶ 2.

{¶ 58} *Smith* must be completely overturned.

{¶ 59} As I stated in my dissent in *Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, Ohio's discretionary-bindover provision, R.C. 2152.12(B), establishes five things. *Smith* at ¶ 55 (Kennedy, J., dissenting). In R.C. 2152.12(B), the General Assembly (1) grants the juvenile court discretionary authority to transfer a juvenile case to adult court, (2) limits the exercise of that discretionary authority based on certain conditions, (3) requires the juvenile court to hold a hearing before it may transfer a case to adult court, (4) states that the authority to grant a discretionary transfer of a case to adult court is triggered by the filing of a

juvenile complaint, and (5) establishes that what the juvenile court transfers is "the case." *Smith* at ¶ 55-59 (Kennedy, J., dissenting).

{¶ 60} Contrary to the majority's holding in *Smith*, "*all* 'the delinquent acts alleged in the complaint' " transfer to the adult court, not just the charges for which the juvenile found probable cause. (Emphasis sic.) *Id*. at ¶ 67 (Kennedy, J., dissenting), quoting R.C. 2152.12(I). This plain reading of the statute—that "the case" transfers to adult court—is supported by other provisions in the statutory scheme. And when the case is transferred to the adult court, the adult court has complete jurisdiction over the case as if it had originated in that court. There is no ambiguity in the language chosen by the General Assembly.

{¶ 61} On transfer to the adult court, the juvenile court loses jurisdiction over the juvenile's case as to the operative facts in the juvenile complaint. R.C. 2152.12(I) provides: "The transfer abates the jurisdiction of the juvenile court with respect to the *delinquent acts alleged in the complaint*, and, upon transfer, all further proceedings pertaining to the act charged shall be discontinued in the juvenile court, and *the case* then shall be within the jurisdiction of the court to which it transferred as described in [R.C. 2151.23(H)]." (Emphasis added.) The force of this provision—that the juvenile court no longer has any jurisdiction over the acts charged in the complaint following transfer and that it is *the case* that is transferred—is reinforced by the text of R.C. 2151.23: "[I]f the case is transferred for criminal prosecution pursuant to [R.C. 2152.12], * * * the juvenile court does not have jurisdiction to hear or determine the case subsequent to the transfer," R.C. 2151.23(H).

{¶ 62} The *Smith* majority not only contorted the language of R.C. 2151.12 to limit what is transferred to the adult court to only the "acts charged," but it also improperly limited the *jurisdiction* of the adult court to only those "acts charged" for which the juvenile court found probable cause. *See* 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, at ¶ 28. But those words of limitation do not appear in

the statute. To the contrary, the General Assembly chose language that makes plain that following transfer, the adult court has full, unfettered authority over the case. There is no jurisdictional bar that prohibits the adult court from considering all the delinquent acts alleged in the juvenile complaint. And because the same majority as in *Smith* holds in this case that the subject-matter jurisdiction of the adult court is implicated, it once again muddies the water as to what subject-matter jurisdiction means.

*C. Subject-matter jurisdiction*

{¶ 63} "Subject-matter jurisdiction refers to the constitutional or statutory power of a court to adjudicate a particular class or type of case." *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, 159 N.E.3d 248, ¶ 23. " 'It is a "condition precedent to the court's ability to hear the case. If a court acts without jurisdiction, then any proclamation by that court is void." ' " *Id.*, quoting *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992, ¶ 11, quoting *State ex rel. Tubbs Jones v. Suster*, 84 Ohio St.3d 70, 75, 701 N.E.2d 1002 (1998). " 'A court's subject-matter jurisdiction is determined without regard to the rights of the individual parties involved in a particular case.' " *Id.*, quoting *Bank of Am., N.A. v. Kuchta*, 141 Ohio St.3d 75, 2014-Ohio-4275, 21 N.E.3d 1040, ¶ 19. "Rather, the focus is on whether the forum itself is competent to hear the controversy." *Id.*; *see also* 18A Wright, Miller & Cooper, *Federal Practice and Procedure*, Section 4428, at 6 (3d Ed.2017) ("Jurisdictional analysis should be confined to the rules that actually allocate judicial authority among different courts").

{¶ 64} " 'Once a tribunal has jurisdiction over both the subject matter of an action and the parties to it, "* * * the right to hear and determine is perfect; and the decision of every question thereafter arising is but the exercise of the jurisdiction thus conferred." ' " (Ellipsis added in *Pizza*.) *Pratts* at ¶ 12, quoting *State ex rel. Pizza v. Rayford*, 62 Ohio St.3d 382, 384, 582 N.E.2d 992 (1992), quoting *Sheldon's Lessee v. Newton*, 3 Ohio St. 494, 499 (1854).

{¶ 65} Article IV, Section 4(A) of the Ohio Constitution provides that "[t]here shall be a court of common pleas and such divisions thereof as may be established by law serving each county of the state," and Article IV, Section 4(B) provides that "[t]he courts of common pleas and divisions thereof shall have such original jurisdiction over all justiciable matters * * * as may be provided by law." As we explained in *State v. Aalim*, "Article IV, Section 4(B) of the Ohio Constitution grants exclusive authority to the General Assembly to allocate certain subject matters to the exclusive original jurisdiction of specified divisions of the courts of common pleas." 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 2.

{¶ 66} The General Assembly exercised that power in enacting R.C. 2151.23(A)(1), which grants juvenile courts exclusive subject-matter jurisdiction over children alleged to be delinquent for committing acts that would constitute crimes if committed by an adult. *See also* R.C. 2931.03 ("The court of common pleas has original jurisdiction of all crimes and offenses, except in cases of minor offenses the exclusive jurisdiction of which is vested in courts inferior to the court of common pleas"). R.C. 2152.12 establishes an exception to that rule, authorizing a juvenile court to relinquish its exclusive jurisdiction in certain cases involving a delinquent child and to transfer the case to the adult court. And once a juvenile court relinquishes jurisdiction, as set forth above, "[t]he transfer abates the jurisdiction of the juvenile court with respect to the delinquent acts alleged in the complaint, and, upon the transfer, all further proceedings pertaining to the act charged shall be discontinued in the juvenile court, and the case then shall be within the jurisdiction of the court to which it is transferred," R.C. 2152.12(I).

{¶ 67} It is therefore within the subject-matter jurisdiction of a juvenile court to transfer a case, and it is within the subject-matter jurisdiction of the adult court to hear the case.

**{¶ 68}** The majority concludes that that the adult court lacked subject-matter jurisdiction to adjudicate Count 29 of the indictment. However, as explained above, the focus of a subject-matter-jurisdiction inquiry is whether the court is the proper forum to hear a specific type of case, and we do not look to the rights of the individual parties to make that determination. So we do not ask whether the adult court had subject-matter jurisdiction under the circumstances specific to Burns's case. Instead, we must determine whether the adult court has the constitutional and statutory power to hear a criminal case involving a juvenile that has been transferred from the juvenile court. Pursuant to Article IV, Section 4(B) of the Ohio Constitution and R.C. 2152.12(I), the adult court is the court in which such a case must be heard. The adult court in this case therefore had subject-matter jurisdiction to adjudicate all the counts charged in the indictment.

**{¶ 69}** And as stated above, R.C. 2151.23(H) establishes that there is no limitation on the jurisdiction of the adult court following transfer: "The court to which the case is transferred for criminal prosecution * * * has jurisdiction subsequent to the transfer to hear and determine the case in the same manner as if the case *originally had been commenced in that court*." (Emphasis added). That jurisdiction "includ[es], but [is] not limited to, jurisdiction to * * * enter a judgment of conviction, * * * whether the conviction is for the same degree or a lesser degree of the offense charged, for the commission of a lesser-included offense, or for the commission of another offense that *is different from the offense charged*." (Emphasis added.) *Id*. Because the plain and unambiguous language of R.C. 2152.12(B) provides that the "case" transfers to the adult court and because under R.C. 2151.23(H), "the case" is to be considered as if it had originally commenced in that court, *Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, was wrongly decided and should be overturned. Once *Smith* is overturned, the judgment of the appellate court in this case should be affirmed, in full.

{¶ 70} Because a majority of this court applies *Smith* to reverse the judgment of the appellate court affirming Burns's conviction on Count 29 of the indictment, I will address that count now.

### D. *Count 29 of the indictment: The aggravated robbery of Victor Ford*

{¶ 71} Count 29 of the indictment concerns the aggravated robbery of Victor Ford on or about January 21, 2018. That charge correlates with Count 30 of the juvenile complaint.

{¶ 72} As noted above, the juvenile court did not make a finding of probable cause as to Count 30 of the juvenile complaint. Relying on *Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, the majority holds that the adult court lacks subject-matter jurisdiction as to Count 29 because the juvenile court's failure to find probable cause as to the acts underlying that count serves as a jurisdictional bar to the adult court's ability to hear the charge. But as discussed above, and as I stated in my dissent in *Smith*, the majority's decision in *Smith* was "unmoored from the plain and unambiguous language of Ohio's discretionary-bindover statute and from the actual legal consequences of a finding of no probable cause," *id.* at ¶ 45 (Kennedy, J., dissenting). Under R.C. 2151.23(H), the adult court had authority to hear and determine the case "in the same manner *as if the case originally had been commenced in that court*." (Emphasis added.) Therefore, the grand jury was free to consider the case that transferred from the juvenile court; that is, it could consider any of the delinquent acts allegedly committed by Burns that were included in the juvenile complaint. And the adult court was free to proceed on any charges the grand jury returned in an indictment that arose from the acts alleged to have been committed in the juvenile complaint, because under the relevant statutes, "the case" transfers to the adult court. "The case" includes the aggravated robbery of Victor Ford.

### III. CONCLUSION

{¶ 73} Burns's months-long campaign of violent and firearm-aided robberies was methodically set forth in the juvenile-court complaint. The juvenile court properly transferred his case—consisting of all the delinquent acts alleged in the complaint—to adult court.

{¶ 74} This case exposes what was wrong with this court's majority decision in *Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297. If a juvenile court has not found probable cause for a charge that is later contained in an adult-court indictment, then according to the *Smith* majority, the adult court lacks subject-matter jurisdiction over that charge. Without a probable-cause finding by the juvenile court as to each particular count, the adult court is powerless to move forward—the juvenile court defines the adult court's jurisdiction. And that is ridiculous.

{¶ 75} As R.C. 2151.23(H) says, the case starts anew in the adult court. The provision in that statute stating that the adult court has "jurisdiction to accept a plea of guilty or * * * accept a verdict and to enter a judgment of conviction * * * for the commission of another offense that is different from the offense charged" establishes that a charge in an indictment can originate in the adult court following transfer. The grand jury's mandate is wide-ranging—it shall "proceed to inquire of and present all offenses committed within the county," R.C. 2939.08.

{¶ 76} The grand jury was authorized to indict Burns on any charge for which it found probable cause to believe he committed. This is just one case that proves the folly of *Smith*. How long before *Smith* is overturned in its entirety?

{¶ 77} I would affirm the judgment of the Eighth District Court of Appeals in full. Because the majority does not do so, I concur in part and dissent in part.

FISCHER and DEWINE, JJ., concur in the foregoing opinion.

———————————

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and

Gregory Ochocki, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Timothy B. Hackett and Abigail J. Christopher, Assistant Public Defenders, for appellant.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, and Samuel C. Peterson, Deputy Solicitor General, urging affirmance for amicus curiae, Ohio Attorney General Dave Yost.

_____