[Cite as *State v. Green*, 2023-Ohio-4360.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,                                    CASE NO. 9-22-13

    PLAINTIFF-APPELLEE,

    v.

ZIAIR GREEN,                                      O P I N I O N

    DEFENDANT-APPELLANT.

**Appeal from Marion County Common Pleas Court**
**Trial Court No. 21-CR-070**

**Judgment Affirmed**

**Date of Decision:  December 4, 2023**

APPEARANCES:

    *Timothy B. Hackett* **and** *Victoria A. Ferr* **for Appellant**

    *Raymond A. Grogan, Jr.* **for Appellee**

**MILLER, P.J.**

{¶1} Defendant-appellant, Ziair E. Green ("Green"), appeals the February 28, 2022 judgment entry of sentence of the Marion County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On January 18, 2021, law enforcement officers responded to numerous reports of gunfire shot at 126 South Seffner Avenue ("126 S. Seffner Ave."), Marion, Ohio. When officers arrived at the scene, they found Ricco McGhee ("McGhee") lying on the sidewalk with a gunshot wound to his chest. McGhee was transported to the hospital where he was subsequently pronounced dead. An autopsy confirmed that his death was the result of a single gunshot wound to the chest.

{¶3} McGhee had been married to Green's mother, Kimberly Floyd ("Floyd"), for many years and was the only father figure in the household. However, McGhee and Floyd were separated by October 2020. Nonetheless, McGhee and Floyd continued to communicate off-and-on despite their separation and McGhee's recent engagement to Lashawn Mosley ("Mosley").

{¶4} On January 18, 2021, McGhee spent the day in Columbus with Mosley. Eventually the pair returned to Marion where they visited friends to watch a sporting game, drink alcohol, and relax. Throughout the day and into the night, McGhee and Floyd were in communication via text message. Later that night, McGhee drove his vehicle, with Mosley as a passenger, to Floyd's house at 126 S. Seffner Ave. When

they arrived at the house at approximately 10:35 p.m., McGhee exited the driver's-side door and entered the unlocked house while Mosley waited in the vehicle. Inside the house, McGhee and Floyd engaged in a confrontation.

{¶5} During the confrontation between McGhee and Floyd, Green exited through the side door of the house with a firearm. Several minutes later, McGhee emerged from the house and walked down the front porch steps onto the sidewalk. There, he spotted Green, who was in possession of the firearm.

{¶6} Green subsequently fired two "warning shots" at McGhee and then pointed the gun at McGhee and fired additional shots. McGhee was struck in the chest by a bullet and fell to the ground. Green ran from the scene and went into hiding for several days. Mosley and Floyd rushed to McGhee and attempted to render aid.

{¶7} On January 19, 2021, a complaint was filed in the Marion County Court of Common Pleas, Family Division ("juvenile court") charging 17-year-old Green with one count of murder in violation of R.C. 2903.02(A) and one count of aggravated murder in violation of R.C. 2903.01(A). That same day, the State filed a motion to bind the case over to the Marion County Court of Common Pleas, General Division, pursuant to Juv. R. 30. Green appeared for an initial appearance on January 28, 2021, wherein he denied the allegations in the complaint.

{¶8} A probable cause hearing was held in the juvenile court on February 11, 2021. At the conclusion of the hearing, the judge found probable cause to believe

that Green committed the offenses alleged in the complaint. Accordingly, the juvenile court relinquished its jurisdiction over the matter and transferred the case to the General Division of the Marion County Court of Common Pleas for prosecution.

{¶9} On February 24, 2021, the Marion County Grand Jury indicted Green on three counts: Count One of murder in violation of R.C. 2903.02(A), an unclassified felony; Count Two of murder in violation of R.C. 2903.02(B), an unclassified felony; and Count Three of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony. Each of the counts also included a three-year firearm specification pursuant to R.C. 2941.145 and R.C. 2929.14(D). Green appeared for arraignment on March 1, 2021 and entered pleas of not guilty to the counts and specifications in the indictment. On March 17, 2021, Green retained new counsel who entered notices of appearance. On March 23, 2021, Green filed a notice of his intent to use self-defense or defense of others as a defense at trial.

{¶10} On April 19, 2021, Green filed a motion for funds to retain an expert witness. The motion did not specify a dollar amount of the request. In a judgment entry filed on April 20, 2021, the trial court deemed the motion filed outside the time set by Crim.R. 12. Nonetheless, the trial court granted the defense $1,500 for the purpose of retaining an expert and directed that further funds be authorized in advance.

{¶11} On April 20, 2021, Green filed a motion for leave to file several pretrial motions instanter. Specifically, Green requested to file a motion to require the State to disclose the victim's criminal history and a motion to allow counsel to review children's services records. On April 22, 2021, the trial court denied the motions. In its attendant judgment entry, the trial court found the motions were untimely filed pursuant to Crim.R. 12. However, in the interest of justice, the trial court reviewed the merits of the motions and denied them on that basis.

{¶12} On May 20, 2021, Green filed an additional motion for allowance of monies to retain an expert witness. In his motion, Green requested an "initial approval" of $9,000 for the proposed expert to examine Green. (Doc. No. 52). On May 27, 2021, the trial court denied the motion. In its judgment entry, the trial court found the motion was untimely and filed outside the timelines of Crim.R. 12 without leave. Nevertheless, the trial court reviewed the merits of the motion and found that Green failed to show how the expert would provide value and that alternative would will provide Green with a defense in this case.

{¶13} On July 12, 2021, Green made a motion for the trial court to approve a general evaluation of Green by District V Forensic Diagnostic Center for the purposes of a referral to a specialist if necessary. The trial court granted Green's motion on July 14, 2021. On September 23, 2021, Green filed a motion for leave to file a motion for allowance of monies to retain an expert witness for additional evaluation of the defendant. On October 22, 2021, the trial court denied Green's

request to file the motion out of time and denied Green's request for additional defense experts at state expense.

{¶14} On January 21, 2022, the State filed a motion to exclude the testimony of four defense witnesses (Deante Smith, Deandre Gale, Timothy Nelson, and Dejaun Smith) listed in the defendant's reciprocal discovery. Green filed a memorandum in opposition to the State's motion on January 26, 2022. The following day, the trial court filed a judgment entry stating that it would give Green the opportunity to proffer the testimony of the four witnesses outside the presence of the jury for the trial court to determine whether their testimony would be admissible.

{¶15} A jury trial commenced on February 1, 2022. On February 10, 2022, the jury returned verdicts finding Green not guilty of Count One, but guilty of Counts Two and Three, and their attendant specifications.

{¶16} At the sentencing hearing held on February 25, 2022, the trial court found that Counts Two and Three merged for the purpose of sentencing. The State elected to proceed to sentencing the more serious offense of murder charged in Count Two and the trial court sentenced Green to a term of 15 years to life in prison to be served consecutively to a term of 3 years for the attendant firearm specification for an aggregate term of 18 years to life in prison.

{¶17} On March 25, 2022, Green filed his notice of appeal. He raises eight assignments of error for our review.

**First Assignment of Error**

**The trial court violated Ziair Green's constitutional right to present a complete defense. Fifth, Sixth, and Fourteenth Amendments, U.S. Constitution; Article I, Sections 1, 10, and 16, Ohio Constitution; Crim.R. 16(B); Evid.R. 404(B), 405, 608, 616(A), 702.**

{¶18} In his first assignment of error, Green argues that the trial court violated his constitutional right to present a complete defense. Specifically, Green claims the trial court prohibited him from presenting evidence that would have undermined the credibility of the State's witnesses and shown he acted in self-defense. He also asserts that the trial court denied him the opportunity to present a complete defense by denying his request for expert funds.

{¶19} The Supreme Court of Ohio has explained:

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restriction." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). And states have a legitimate interest in ensuring that triers of fact are presented with reliable evidence and have "broad latitude under the Constitution to establish rules excluding evidence from criminal trials" to further that goal. *Scheffer* at 308, 309, 118 S.Ct. 1261, 140 L.Ed.2d 413. Such "rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve'" and if they do not "infringe[] upon a weighty interest of the accused." *Id.* at 308, 118 S.Ct. 1261, 140 L.Ed.2d 413, quoting *Rock v. Arkansas*, 483 U.S. 44, 56, 58, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

*State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 59.

**{¶20}** Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of that discretion and material prejudice. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion implies that the trial court acted unreasonably arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

*Children's Services Records*

**{¶21}** Green alleges he was denied the right to present a complete defense due to the trial court's denial of his motion to allow his counsel to review any children's services records relating to McGhee or Floyd. Specifically, Green argues the trial court erred by denying his request to review children's services records without at least conducting an in-camera review of the records.

**{¶22}** On April 20, 2021, Green filed a motion for leave to file pretrial motions instanter. Attached to that motion was a motion to allow counsel to review records maintained by Marion County Children's Services relating to McGhee or Floyd. In a judgment entry filed on April 22, 2021, the trial court denied Green's motion for leave to file pretrial motions instanter. The trial court specified that counsel was explicitly instructed not to file motions outside of Crim.R. 12(D) without leave of the court and noted that Green provided no reasonable explanation for the lateness of the motions. Nonetheless, the trial court addressed the merits of Green's motion to review children's services records and found that the records are

not relevant to the instant case. The trial court specifically stated that it "will not authorize a fishing expedition to defame or dehumanize the deceased [victim]." (Doc. No. 30).

{¶23} A trial court has discretion to decide whether certain information is or is not discoverable. *See State v. Orwick*, 153 Ohio App.3d 65, 2003-Ohio-2682, ¶ 13, citing *Radovanic v. Cossler*, 140 Ohio App.3d 208, 213 (8th Dist.2000). As such, we will not disturb the trial court's decision on that issue absent an abuse of that discretion. *Id.*

{¶24} Crim.R. 16(B)(5) provides that a criminal defendant is entitled to discovery of evidence which is "favorable to the defendant and material to either guilt or punishment." However, when the potential discovery involves children's services records, "this requirement comes into conflict with the confidentiality that attaches to such records." *State v. Branch*, 3d Dist. Allen No. 1-12-44, 2013-Ohio-3192, ¶ 85, citing *Johnson v. Johnson*, 134 Ohio App.3d 579, 583 (3d Dist.1999).

{¶25} The Supreme Court of the United States has held that "a defendant's due process right to a fair trial entitles him to an in camera inspection by the trial court of confidential child services records to assess whether they contain evidence that is material to the defendant's guilt." *Branch* at ¶ 85, citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 60, 107 S.Ct. 989 (1987). This court has refined the rule in *Ritchie* as:

> [A] court may conduct an *in camera* inspection of child-abuse records
> or reports and also has the *inherent power* to order disclosure of such

records or reports where (1) the records or reports are relevant to the pending action, (2) good cause for such a request has been established by the person seeking disclosure, and (3) where admission of the records or reports outweighs the confidentiality considerations set forth in R.C. 5153.17 and R.C. 2151.421(H)(1).

(Emphasis sic.) *Johnson* at 585. *See Branch* at ¶ 85.

**{¶26}** "'However, the *Richie* court also held that a defendant may not require the trial court to search through confidential records "without first establishing a basis for his claim that it contains material evidence."'" *State v. Stock*, 5th Dist. Stark No. 2017 CA 00199, 2018-Ohio-4805, ¶ 43, quoting *State v. Brown*, 5th Dist. Delaware No. 2005CAA01002, 2005-Ohio-5639, ¶ 68, quoting *Ritchie* at 58, fn.15. "'"[A] defendant is entitled to the trial court's in camera inspection of children services agency records where the defendant shows that there is a reasonable probability, grounded on some demonstrable fact, that the records contain material relevant to the defense."'" *Id.*, quoting *Brown* at ¶ 70, quoting *State v. Allan*, 6th Dist. Lucas No. L-94-272, 1996 WL 38784, *2 (Feb. 2, 1996).

**{¶27}** Here, we find that, in his motion to review children's services records, Green failed to show there was a reasonable probability, grounded on some demonstrable fact, that the records he sought contained material evidence relevant to his defense. First, we note that the record on appeal is not clear that the children's services records Green requests even exist. At the pretrial held on April 15, 2021, defense counsel stated that he sent a subpoena to Children's Services for "some records that apparently do not exist." (Apr. 15, 2021 Tr. at 6). The defense indicated

-10-

its intention to refile the subpoena "requesting different records." (*Id.*). Yet, the record does not indicate that defense counsel actually refiled the subpoena requesting the "different records." In its judgment entry denying Green's motion to review children's services records, the trial court, likewise, questioned the existence of the records. (Doc. No. 30). It is at least plausible that Green would have been aware of the existence of records relating to his mother and stepfather with himself as the child-victim. Furthermore, Green's trial counsel is in the best position to know if such records exist, through his client, yet he was unable to establish the existence of the records he sought, much less that the records, if they exist, contain material evidence relevant to his defense. Because Green was unable to meet this burden, we find that the trial court was not required to conduct an in camera inspection of the records prior to overruling Green's motion to review children's services records. *See Brown* at ¶ 72.

*Exclusion of Prior Bad Acts Testimony*

{¶28} Green alleges that the trial court erred by excluding witness testimony regarding specific instances of McGhee's alleged abuse of Green and Floyd.

{¶29} Again, the admissibility of evidence is within the sound discretion of the trial court. *State v. Duncan*, 3d Dist. Allen No. 1-19-75, 2020-Ohio-3916, ¶ 11. We review a trial court's determination on the admission of evidence under an abuse of discretion standard. *State v. Sullivan*, 3d Dist. Hancock No. 5-17-09, 2017-Ohio-8937, ¶ 20.

**{¶30}** Evid.R. 404 and 405 relate to the introduction of character evidence. Evid.R. 404(A) provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." However, Evid.R. 404(A)(2) provides several exceptions to this general rule as it relates to the character of the victim. In pertinent part, Evid.R. 404(A)(2) provides that:

> Evidence of a pertinent trait of character of the victim of the crime offered by the accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible[.]

> Evid.R. 405, which governs the methods of proving character, states:

> (A) In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

> (B) In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

**{¶31}** In *State v. Barnes*, the Supreme Court of Ohio held that "Evid.R. 405(B) precludes a defendant from introducing specific instances of the victim's conduct to prove that the victim was the initial aggressor." *State v. Barnes*, 94 Ohio St.3d 21, 24, 2002-Ohio-68. The Court also noted that "[a] defendant may successfully assert self-defense without resort to proving *any* aspect of the victim's character." (Emphasis sic.) *Id.*

**{¶32}** However, we have "interpreted Evid.R. 405 as permitting a defendant to 'testify about specific instances of the victim's prior conduct known to the defendant in order to establish the defendant's state of mind.'" *State v. Smith*, 3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 18, quoting *State v. Moore*, 3d Dist. Allen Nos. 1-06-89 and 1-06-96, 2007-Ohio-3600, ¶ 59. "The crucial element of a self-defense claim is the defendant's state of mind, not the character of the victim." *Moore* at ¶ 59.

**{¶33}** Here, Green contends that the trial court erred by prohibiting testimony regarding specific acts of violence perpetuated by McGhee toward Green and Floyd. Defense counsel sought to present four possible defense witnesses: Deante Smith, Deandre Gale, Timothy Nelson, and Dejaun Smith. According to defense counsel, the individuals had witnessed instances of McGhee acting in a violent manner toward Green in the months leading up to McGhee's death. (Feb. 1-10, 2022 Tr. at 424-425). The trial court agreed that the proper procedure would be for the defense to proffer the testimony of the four witnesses at the beginning of the defense's case-in-chief, so the trial court could make a decision on the admissibility of the potential witnesses' testimony at that time.

**{¶34}** However, Green chose not to proffer the testimony of the four witnesses and instead conceded that the specific acts evidence to which they were going to testify were not admissible. (Feb. 1-10, 2022 Tr. at 987). Accordingly, the trial court never ruled on the admissibility of the witnesses' potential testimony,

and, thus, there is no decision on the admissibility of the potential witnesses' testimony for us to review.

{¶35} Green also alleges the trial court erred by prohibiting testimony from detectives regarding prior shootings at the home, and testimony from Floyd and Dasani Hooks, Green's sister, about the domestic violence Green and Floyd endured at the hands of McGhee. However, despite the trial court's repeated offer for the defense to proffer the testimony, defense counsel made the strategic decision to not offer this additional testimony. Accordingly, we are not able to review the admissibility of the potential testimony because it is not included in the record.

{¶36} "'An alleged victim's purported violent nature is not an essential element of self-defense and therefore, witnesses other than the defendant have no admissible basis for testifying to specific instances of violent conduct.'" *State v. Gott*, 6th Dist. Lucas No. L-11-1070, 2013-Ohio-4624, ¶ 36, quoting *State v. Willamson*, 4th Dist. Ross No. 95CA2155, 1996 WL 530008, *4 (Sept. 12, 1996). Furthermore, we note that a trial court's Evid.R. 405(B) ruling is subject to harmless error analysis. *Smith*, 2013-Ohio-746, at ¶ 20. "The improper exclusion of evidence is harmless where the remaining evidence provides overwhelming proof of a defendant's guilt." *Id.* Accordingly, even if the trial court erred by informing the parties that specific acts evidence were not admissible in a self-defense case, that error is harmless because the State offered overwhelming evidence of Green's guilt.

{¶37} Moreover, a plethora of testimony regarding McGhee's demeanor, character, and reputation for violence was presented to the jury by a number of witnesses. Specifically, Floyd and Green gave an account of the violent acts McGhee allegedly engaged in on January 18, 2021, prior to his death, including slamming Floyd against the wall and attempting to choke her and threatening Green. Floyd testified that McGhee had a reputation for violence and that this reputation for violence caused her to fear for herself and for Green. Green testified that McGhee "has always been violent" and that he was "afraid" of McGhee on January 18, 2021. (Feb. 1-10, 2022 Tr. at 1251-1252). Hooks testified that she had been around McGhee for a significant portion of her life and that she has experienced behaviors from him that leads her to characterize living in a home with McGhee as "[u]nhealthy." (*Id.* at 1224-1225). Hooks also testified to McGhee's reputation in the community as a drug dealer who was angry, toxic, and a threat. (*Id.* at 1227-1229). Moreover, several witnesses mentioned prior shootings that occurred at the residence. Additionally, law enforcement officers acknowledged their familiarity with McGhee through prior law enforcement contact. Mosley also testified that McGhee served nearly seven years in prison. (*Id.* at 781). Thus, the jury heard significant testimony regarding McGhee's previous conduct and reputation. The fact that there was violence in and about the home at the time that McGhee was there was known to the jury. Perhaps most notably, the jury heard Green's testimony that he was afraid of McGhee on the day of the shooting and "feared for

[his] life" during the final encounter. (*Id.* at 1261). Accordingly, based on the record in front of us, we do not find that the potential exclusion of some testimony regarding specific acts of violence would have affected the outcome of the trial and was "essentially meaningless." *Smith* at ¶ 21.

*Expert Witness Funding*

{¶38} Green argues that he was denied the right to present a complete defense due to the trial court's denial of Green's motions for expert funding. "The authority to fund defense experts rests within the sound discretion of the trial court." *State v. Babcock*, 5th Dist. Stark No. 2011CA00286, 2012-Ohio-3627, ¶ 28. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶39} "As a matter of due process, indigent defendants are entitled to receive the 'raw materials' and the '"basic tools of an adequate defense,"'" which may include the provision of expert assistance. *State v. Mason*, 82 Ohio St.3d 144, 149 (1998), quoting *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087 (1985), quoting *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431 (1971). "'Due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, does not require the government to provide expert assistance to an indigent criminal defendant in the absence of a particularized showing of need.'" *State v. McCallum*, 10th Dist. Franklin No. 19AP-796, 2021-Ohio-2938, ¶ 28, quoting *Mason* at 150. "'Nor does

it require the government to provide expert assistance to an indigent criminal defendant upon mere demand of the defendant.'" *Id.*, quoting *Mason* at 150.

**{¶40}** The statutory authority allowing the state to provide funds for an indigent defendant's expert is R.C. 2929.024, which provides, in pertinent part:

> [I]f the court determines that investigation services, experts, or other services are reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial or at the sentencing hearing, the court shall authorize the defendant's counsel to obtain the necessary services for the defendant, and shall order that payment of the fees and expenses for the necessary services be made in the same manner that payment for appointed counsel is made pursuant to Chapter 120 of the Revised Code. If the Court determines that the necessary services had to be obtained prior to court authorization for payment of the fees and expenses for the necessary services, the court may, after the services have been obtained, authorize the defendant's counsel to obtain the necessary services and order that payment of the fees and expenses for the necessary services be made as provided in this section.

"In noncapital cases, however, there is no authority mandating the payment of an indigent defendant's expert fees." *State v. Hurley*, 3d Dist. Putnam No. 12-11-01, 2012-Ohio-310, ¶ 15. "Ohio courts have nonetheless applied the factors used by the Ohio Supreme Court in resolving requests for state-funded experts pursuant to R.C. 2929.024 in non-capital cases." *Id.* "The relevant factors in resolving the appointment of a state-funded expert are: (1) the value of the expert assistance to the defendant's proper representation at trial; and (2) the availability of alternative devices that fulfill the same functions as the expert assistance sought." *Id.*

**{¶41}** Furthermore, the Supreme Court of Ohio has held that "[d]ue process, as guaranteed by the Fifth and Fourteenth Amendments to the United States

-17-

Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." *State v. Mason*, 82 Ohio St.3d 144, 150 (1998).

{¶42} When a defendant requests expert funds, the burden is on the defendant to demonstrate the reasonableness of the request. *Hurley* at ¶ 15. "A defendant must provide a trial court with facts to establish a particularized need for expert assistance and must demonstrate more than a mere possibility of assistance to receive an expert witness at the state's expense." *Babcock*, 2012-Ohio-3627, at ¶ 30. "'At a minimum, the indigent defendant must present the trial judge with sufficient facts with which the court can base a decision.'" *Hurley* at ¶ 15, quoting *State v. Weeks*, 64 Ohio App.3d 595, 598 (12th Dist.1989). "Undeveloped assertions that the proposed assistance would be useful to the defense are patently inadequate." *Id.*

{¶43} Here, Green argues that the trial court abused its discretion by denying several of his attempts to secure expert funds. After reviewing the record and the relevant law, we find Green's arguments to be without merit.

**{¶44}** On April 19, 2021, Green filed a motion for allowance of monies to retain an expert witness. In the motion, Green stated that he contacted a forensic psychologist, Dr. Bob Stinson, out of Columbus, Ohio, "who would testify regarding the potential Battered Person Syndrome and effects of abuse at trial * * * and the affects abuse may have had on the Defendant at the time the incident giving rise to this matter occurred." (Doc. No. 26). Green did not request or specify the amount of funds he was requesting.

**{¶45}** The following day, the trial court noted that the motion was filed outside the time limits set by Crim.R.12(D) without leave of court.[1] (Doc. No. 28). The trial court specifically stated that it explicitly instructed the parties not to file motions outside the time limit set by the rule without leave of Court. (*Id.*). Nonetheless, the trial court "reluctantly" granted Green up to $1,500 for the purpose of retaining an expert. (*Id.*). The trial court noted that "[a]ny further amounts must be authorized <u>in advance</u> or they will not be approved." (Emphasis sic.) (*Id.*). The trial court further noted Green's motion "gives no guidance as to an amount needed, but merely ask[ed] [the] Court to write a blank check." (*Id.*). The trial court noted that it would "not be so reckless with taxpayer funds." (*Id.*). The trial court further stated that "[t]he granting of these funds is not an indication that any testimony

---

[1] On April 20, 2021, after the trial court filed its judgment entry noting the tardiness of Green's motion for allowance of monies, in response thereof, Green filed a motion for leave to file pretrial motions instanter. (Doc. No. 29).

generated from these funds is relevant or admissible or even that Counsel has made a showing that an expert is even necessary in this case." (*Id.*).

**{¶46}** On May 5, 2021, Green filed a motion for a continuance of the jury trial on the grounds that the expert witnesses contacted by the defense were likely to need more time to evaluate Green prior to trial. At a pretrial held on May 7, 2021, the trial court and the parties discussed the defense's progress in procuring an expert witness. The defense stated that it consulted a new potential expert witness, Dr. Davis, who informed counsel he needed between $2,500 to $3,000 to "get started." (May 7, 2021 Tr. at 3-5) The trial court requested the defense provide the trial court with information regarding the potential expert's estimated fees for (1) interviewing Green and rendering an opinion, (2) rendering the opinion in writing, and (3) testifying at trial. (*Id.* at 5-7). The trial court indicated its preference to approve the fees in incremental amounts so that if the defense determines that they do not want or need some of the services, the court is "not already on the hook" for the expense. (*Id.* at 7). The court remarked that requesting and approving expert fees in increments has been the court's practice for 20 years. (*Id.* at 8-9). The court requested the defense file a motion informing the court whether the $1,500 it previously allotted in funds would be sufficient for the potential expert witness to examine Green and render an opinion. (*Id.* at 8).

**{¶47}** At the pretrial, the parties also discussed Green's pending motion for a continuance for the purpose of pursing an expert witness. The trial court

acknowledged that Green "has an absolute right to a full defense" and that an expert consultation is "appropriate" in this case. (*Id.* at 13). On that basis, the trial court granted Green's motion for a continuance. (*Id.* at 19).

{¶48} On May 20, 2021, Green filed a motion styled "Amended Motion for Allowance of Monies to Retain Expert Witness and Motion to Continue Pretrial and Trial." (Doc. No. 52). In the motion, Green stated that he had been in contact with yet another prospective expert, Dr. Jolie S. Brams, a forensic psychologist who could testify regarding potential battered person syndrome, the effects of abuse, and the effects abuse may have had on Green at the time of the relevant conduct. Green stated that the potential expert required an "an initial approval of $9,000.00." (Doc. No. 52).

{¶49} On May 27, 2021, the trial court filed a judgment entry denying Green's motion on the grounds that: (1) although styled as an "amended" motion, Green's filing was a new motion seeking new funds for a new expert and is, therefore, untimely and filed without leave pursuant to Crim.R. 12(D); (2) Green failed to show the expert would provide value; (3) alternative means will provide Green with a defense; (4) the proposed expert is not willing to prepare for trial in a timely manner; and (5) the expert has not justified the amount requested nor articulated if $9,000 would address the costs of trial preparation and testimony. (Doc. No. 55). The trial court noted that the $9,000 requested in Green's motion "is the highest request for an appointed expert in a non-capital case [it] has ever seen."

(*Id.*). The court further stated that the request did not provide an explanation as to whether the amount will cover the cost of the diagnostics or "if it is a down payment on a much larger request that will come later." (*Id.*). The court further found that Green failed to show that the proposed expert would provide value or that there were no alternative devices available to fulfill the same function. (*Id.*).

{¶50} On June 29, 2021, Green's trial counsel filed another motion to continue the jury trial due to trial counsel's continued search for an expert witness. At the pretrial held on July 5, 2021, the trial court and the parties discussed Green's continued search for an expert witness and his pending motion to continue. While addressing the matter, the trial court stated:

> I want to make it clear. The Court, if an expert is needed in this case, certainly wants the defense to get one. But it seems to me that the defense is shopping for a particular type of expert and having trouble finding one and that the ones that they have found kind of want a carte blanche with regard to how much money they're going to be able to make off of this case and also want to dictate to the Court a schedule. And this Court controls its own schedule. * * * I'm inclined to give [the defense] some time, but it's not endless time.

(July 5, 2021 Tr. at 4-5).

{¶51} Green's trial counsel then stated that the pending request for a continuance would likely be the last continuance it requested. (*Id.* at 5). The defense explained that it was in contact with District V Forensic Diagnostic Center. The trial court indicated its approval of trial counsel's plan to start with a more general practitioner through District V Forensic Diagnostic Center and to request additional evaluation and evaluations if indicated. (*Id.* at 6-9). Defense counsel

-22-

stated that it wanted to make sure Green has the best possible defense and that counsel is "very appreciative of the Court offering funds on our request to make that happen." (*Id.* at 9). The trial court then granted Green's pending motion for a continuance and granted leave for Green to file a motion for Green to be evaluated by District V Forensic Diagnostic Center. (*Id.* at 10-12).

{¶52} On July 12, 2021, Green filed a motion seeking the trial court to approve a general psychological evaluation of Green by District V Forensic Diagnostic Center "for the purposes of a referral to a specialist if necessary." (Doc. No. 64). On July 14, 2021, the trial court approved the motion. (Doc. No. 65).

{¶53} At a pretrial held on September 13, 2021, the parties were in receipt of the general psychological evaluation dated September 8, 2021 that was prepared by Dr. Alison Houle following her evaluation of Green. (Sept. 13, 2021 Tr. at 4). The trial court stated that the evaluation made several diagnostic claims including mild cannabis use disorder and post-traumatic stress disorder ("PTSD"). (*Id.*). However, the court noted it did not see any mention of battered-person syndrome as a diagnosis and that there was nothing in the report to lead the trial court to believe that further evaluation along those lines was necessary. (*Id.* at 5). Defense counsel indicated that, based on the report, it "believes the door is open" for further evaluation. (*Id.* at 7-8). The trial court then requested that Green file a written motion indicating the basis for additional evaluation. (*Id.* at 8, 10-11).

{¶54} On September 23, 2021, Green filed a motion to continue the jury trial on the basis of potential additional expert evaluation. (Doc. No. 69). That same day, Green also filed a motion for leave to file pretrial motions instanter. Attached to that motion was a proposed motion for allowance of monies to retain an expert witness for additional evaluation of Green. In the motion, Green requested the trial court approve funds for having Green further evaluated "by an expert who can extrapolate deeper issues surrounding [his] diagnosis" by Dr. Houle. (Doc. No. 70).

{¶55} At the pretrial held on October 21, 2021, the parties addressed Green's pending motions. The trial court granted Green's motion for a continuance. (Oct. 21, 2021 Tr. at 6-7). Then, the trial court addressed Green's pending motion for funds for additional expert evaluation. (*Id.* at 8-9). The trial court stated that the psychological evaluation does not recommend another specialist or psychologist examine Green for further diagnosis. (*Id.* at 9). The court indicated its opinion that the defense has not established grounds for the trial court to grant an additional expert evaluation and witness but that it would take the matter under advisement. (*Id.* 10-11). Defense counsel stated that it was in contact with District V Forensic Diagnostic Center regarding the possibility of a witness correlating the diagnosis between PTSD and battered person's syndrome. (*Id.* at 11-12). The trial court indicated that if counsel filed supplemental briefing on the matter based on the conversation with an expert, then the trial court would consider that. (*Id.* at 14-15). The following day, the trial court filed its judgment entry denying Green's request

for additional experts on the grounds that defendant had not met his burden to show an additional expert is appropriate and had not shown significant value in requesting a second defense expert to seek a diagnosis. (Doc. No. 105).

{¶56} At a January 28, 2021 pretrial and motion hearing, the defense indicated Dr. Houle was anticipated to proffer testimony during the trial. (Jan. 28, 2022 Tr. at 60). The defense informed the trial court of Dr. Houle's hourly rate to appear in court, which the trial court agreed to pay. (*Id.* at 61).

{¶57} After reviewing the record, we reject Green's argument that the trial court erred by denying his request for expert funding. Green contends that the trial court's denial of his requests for expert funds was "unreasonable" and "arbitrary." (Appellant's Brief at 21). However, the record indicates the trial court was willing to allocate funds for expert evaluation of Green within reasonable parameters; and, in fact, the trial court did grant several of Green's motions for expert evaluations and continuances for the purpose of allowing Green's trial counsel to consult potential expert witnesses.

{¶58} Additionally, the trial court expressed a continued willingness to consider Green's requests for expert evaluations and funding provided that Green's defense counsel provided the court with information indicating that the evaluations were reasonable and were reasonably calculated to assist in Green's defense. However, Green never provided the trial court with information indicating the scope of its request and articulable reasons for the requests. Nor did trial counsel address

the availability or lack thereof of alternative devices that fulfill the same functions as the expert assistance sought.

**{¶59}** Green was evaluated by an expert who diagnosed him and provided treatment recommendations. Ultimately, the evaluation did not produce the diagnosis of battered person syndrome that Green's trial counsel continued to seek. Yet, Green never demonstrated a particularized need for such an expert. "Asserting the mere possibility that an expert would be of assistance did not satisfy appellant's initial burden to establish the reasonableness of his request." *See State v. Alltop*, 12th Dist. Fayette No. CA2013-06-018, 2014-Ohio-1695, ¶ 15. Our review of the record indicates the trial court was more than willing to provide funds for experts, provided the defense could provide a breakdown of the anticipated expenses and could demonstrate that the expert was reasonably necessary to advance the defense's case. However, Green was unable or unwilling to satisfy his initial burden to establish the reasonableness of his request. Accordingly, we do not find that the trial court abused its discretion by denying Green's motions for allocation of expert funds.

*Exclusion of Dr. Houle's Report and Testimony*

**{¶60}** Green argues that the trial court erred by excluding Dr. Houle's report and witness testimony at trial.

**{¶61}** With respect to Dr. Houle's report, we note that neither party moved to admit the report. In fact, the defense specifically remarked it had "no plans" to

admit Dr. Houle's evaluation. (Feb. 1-10, 2022 Tr. at 1199). Accordingly, the trial court did not make a decision regarding the admissibility of Dr. Houle's report for us to review. Furthermore, the document is not part of the record on appeal, and, as such, we cannot review it.

{¶62} Regarding Dr. Houle's testimony, Green argues the trial court erred by not admitting Dr. Houle's expert testimony. At trial, the defense proffered the testimony of Dr. Houle. In her proferred testimony, she stated that she performed a complete psychological evaluation of Green. (*Id.* at 1176). Following her evaluations, she diagnosed Green with PTSD and cannabis use disorder. (*Id.* at 1179)

{¶63} Dr. Houle spoke generally about the impact of adverse childhood experiences on an individual and the possible impact those experiences can have for children's risk of mental health symptoms, PTSD, depression, anxiety, and substance abuse. (Feb. 1-10, 2022 Tr. at 1179-1180). She testified that when she evaluated Green, she determined that he had experienced some adverse childhood experiences. (*Id.* at 1180-1181).

{¶64} Dr. Houle stated that she reviewed the discovery and is aware of what happened on January 18, 2021; however, she did not specifically evaluate Green's mental state on that day. (*Id.* at 1181). She testified that, generally, children exposed to repeated trauma have a higher likelihood of perceiving something as being dangerous when it is not or, conversely, failing to recognize an actual threat.

(*Id.* at 1181-1182). Dr. Houle testified that, in her professional experience, Green's childhood experiences shaped his view of the world and how he responds to other people. (*Id.* at 1183-1184). Dr. Houle also spoke, in general terms, about brain development and the result of trauma on brain development. (*Id.* at 1185).

**{¶65}** On cross-examination, Dr. Houle stated that she did not complete an evaluation for NGRI in this case; and, accordingly, never evaluated Green's mental state at the time of this offense. (Feb. 1-10, 2022 Tr. at 1190). She stated that during her conversations with Green, she gathered that Green has unfavorable opinions of McGhee. (*Id.* at 1191). She stated that Green resented McGhee, was jealous of him, and believed that McGhee was loved more by his mother than was Green. (*Id.*).

**{¶66}** Dr. Houle stated that she is familiar with the term "battered woman syndrome," and that it is not a subtype or subset of PTSD. (*Id.* at 1193-1194). She clarified that she did not specifically evaluate Green for battered child syndrome. (*Id.* at 1194). She also stated that her report could not be of assistance to the trier of fact with respect to determining Green's guilt or innocence. (*Id.* at 1195). In her proffered redirect examination, Dr. Houle stated that Green's childhood experiences could have contributed to how he reacted on January 18, 2021. (*Id.* at 1196).

**{¶67}** At the conclusion of Dr. Houle's proffered testimony, the trial court determined that her testimony was not admissible, and Dr. Houle did not testify to the jury.

{¶68} After reviewing the record, we do not find the trial court abused its discretion by excluding Dr. Houle's testimony. Dr. Houle did not evaluate Green for battered child syndrome and testified that she was not qualified to make that diagnosis. Furthermore, Dr. Houle never evaluated Green's mental state on the day of the incident and her proffered testimony was too general to be of relevance to assist the jury in determining Green's guilt or innocence.

*Impeachment with Prior Inconsistent Statements*

{¶69} Green contends that the trial court erred by not allowing him to impeach Mosley with prior inconsistent statements. Specifically, Green alleges the trial court should have allowed him to impeach Mosley with her statement from the preliminary hearing where she testified that McGhee walked down the stairs and turned directly toward Green. Green also alleges the trial court erred by not allowing him to impeach Mosley with a recorded cell-phone video depicting Mosley telling Floyd that she erased cell phone evidence and lied to the police on the scene because she had hidden drugs in Floyd's couch the night of McGhee's death.

{¶70} Evid.R. 613, which governs impeachment by self-contradiction, provides as follows:

> (A) In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.
>
> (B) Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

(2) The subject matter of the statement is one of the following:

(a) A fact that is of consequence to the determination of the action other than the credibility of a witness;

(b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);

(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

(C) During examination of a witness, conduct of the witness inconsistent with the witness's testimony may be shown to impeach. If offered for the sole purpose of impeaching the witness's testimony, extrinsic evidence of the prior inconsistent conduct is admissible under the same circumstances as provided for prior inconsistent statements by Evid.R. 613(B)(2).

**{¶71}** After reviewing the record, we do not find that the trial court erred by not admitting the extrinsic evidence of prior inconsistent statements to impeach Mosley.

**{¶72}** The video of Floyd and her friends confronting Mosley regarding allegedly hiding drugs in Floyd's couch was proffered by the defense as Defense Exhibit I and is included in the record. After reviewing the video in concert with our review of the record, we find that the trial court did not err by failing to admit the video as a means of impeaching Mosley. Although the video may have been offered "solely for the purpose" of impeaching Mosley, pursuant to Evid.R.

613(B)(1), it was of no other "consequence to the determination of the action." Whether Mosley hid drugs in Floyd's couch while the women were talking to the police following the shooting on January 18, 2021 is immaterial to the ultimate issue of Green's potential criminal liability for McGhee's death. *See Gutoskey v. Gallagher*, 8th Dist. Cuyahoga No. 81377, 2002-Ohio-6846, ¶ 18. Moreover, Mosley admitted that although she "was drinking that night" and could not recall the specifics, she did tell Floyd that she put something in her house that night "to get her out of my face." (Feb. 1-10, 2022 Tr. at 794-795). "If a witness admits making a conflicting statement, there is no need for extrinsic evidence." *State v. Spaulding*, 6th Dist. Sandusky No. S-16-028, 2017-Ohio-7993, ¶ 16.

**{¶73}** Moreover, our review of the video indicates that its prejudicial value outweighs its probative value.[2] The video presents an intimidating situation in which Mosley is confronted by multiple people, including Floyd, who are screaming at Mosley and trying to get her to admit that she hid a phone from law enforcement. The video is also replete with racial epithets and offensive language.

**{¶74}** With respect to the transcript of the preliminary hearing, our review of the record indicates that, on cross-examination, defense counsel read the relevant

---

[2] In addition to the trial court's concern that the prejudicial value of Defense's Exhibit I outweighs its probative value, the trial court expressed concern that Green's trial counsel received the video mere days before the commencement of trial, despite the recording happening approximately six months prior. Although the record indicates defense counsel turned over the recording to the State soon after the video came into the defense's possession, the State and trial court expressed concern regarding the delayed disclosure of the potential evidence.

portion of the transcript of the preliminary hearing in open court. Accordingly, the jury heard Mosley's alleged inconsistent statement.

*Conclusion*

**{¶75}** For the foregoing reasons, we do not find that Green was denied his constitutional right to present a complete defense. Green's first assignment of error is overruled.

### Second Assignment of Error

**The trial court erred and violated Ziair's right to a fair trial when it instructed the jury that Ohio's stand-your-ground statute did not govern Ziair's trial, which took place after the statute's effective date. R.C. 2901.09(C).**

### Third Assignment of Error

**Even under the former statute, the trial court erred when it instructed the jury that Ziair had an "on-going" duty to retreat. R.C. 2901.05; R.C. 2901.09.**

**{¶76}** For ease of discussion, we will address Green's second and third assignments of error together. In his second assignment of error, Green argues the trial court erred by not giving the jury a self-defense instruction consistent with the changes to R.C. 2901.09 enacted in 2020 Am.S.B. 175("S.B. 175"), the "stand your ground" law.

**{¶77}** "Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder." *State v. Shine-Johnson*, 10th Dist. Franklin No. 17AP-194, 2018-Ohio-3347, ¶ 25. "Requested jury instructions should ordinarily be given if

they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. "The relevant principle for jury instructions is not one of abstract correctness, but is whether an instruction—even if a correct statement of law—is potentially misleading." *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 52.

{¶78} As a general matter, whether to give a particular jury instruction is within the trial court's discretion, which an appellate court will not disturb absent an abuse of discretion. *State v. Orians*, 179 Ohio App.3d 701, 2008-Ohio-6185, ¶ 10 (3d Dist.). However, a defendant who fails to object to the trial court's decision regarding jury instructions forfeits all but plain error on appeal. *See State v. Kean*, 10th Dist. Franklin No. 17AP-427, 2019-Ohio-1171, ¶ 65. We note that Green's trial counsel did not object to the trial court's determination that the amended version of R.C. 2901.09 did not apply to the instant case because the offense occurred prior to the effective date of the amended statute. However, Green's counsel did object to the trial court's express instruction that stand your ground was not applicable in the case and would have preferred that the trial court not include any reference to stand your ground in the jury instructions. Green's counsel also objected to the trial court instructing the jury that Green had a duty to retreat.

{¶79} In contrast, "[w]hether the jury instructions correctly state the law is a question that is reviewed de novo." *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-

4347, ¶ 135. "An incorrect or inadequate instruction that misleads the jury or otherwise prejudices the defendant constitutes reversible error." *State v. Hughkeith*, 8th Dist. Cuyahoga No. 111647, 2023-Ohio-1217, ¶ 75, citing *Simbo Properties, Inc. v. M8 Realty, L.L.C.*, 8th Dist. Cuyahoga No. 107161, 2019-Ohio-4361, ¶ 18.

{¶80} Here, the offenses occurred on January 18, 2021 and the jury trial commenced on February 1, 2022. R.C. 2901.09 was amended on April 6, 2021. Thus, the statute was amended after the offense but prior to the commencement of trial.

{¶81} Prior to the April 6, 2021 amendments, R.C. 2901.09 stated:

> a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another.

{¶82} The current version of R.C. 2901.09, as amended by S.B. 175, provides, in pertinent part:

> (B) For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence *if that person is in a place in which the person lawfully has a right to be.*
>
> (C) *A trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense, defense of another, or defense of that person's residence reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety.*

(Emphasis added.)

{¶83} Here, the parties disagree whether the version of R.C. 2901.09 effective at the time of the offense or the one effective at the time of trial applied to the instant case. Green argues the trial court should have given jury instructions consistent with the amended version of R.C. 2901.09, the version of the statute that was in effect at the time of trial. Conversely, the State contends that the version of the statute effective at the time of the offense applied in the instant case; and, thus, the trial court did not err by instructing the jury in accordance therewith.

{¶84} We have not yet addressed whether Ohio's stand-your-ground law applies in situations, like the present one, where the conduct occurred prior to the statute's effective date of April 6, 2021 but the trial occurred after the effective date. However, other appellate districts have considered the question and come to different conclusions. At least four appellate districts –the First, Second, Eighth, and Ninth- have held that Ohio's stand your ground law does not apply in situations where the conduct occurred prior to April 6, 2021. *State v. Parker*, 1st Dist. Hamilton No. C-210440, 2022-Ohio-3831, ¶ 7-17; *State v. Degahson*, 2d Dist. Clark No. 2021-CA-35, 2022-Ohio-2972, ¶ 14-23, *appeal allowed*, 168 Ohio St.3d 1457, 2022-Ohio-4617; *State v. Barker*, 2d Dist. Montgomery No. 29227, 2022-Ohio-3756, ¶ 34-43, *appeal not allowed*, 169 Ohio St.3d 1431, 2023-Ohio-381; *State v. Jones*, 2d Dist. Montgomery No. 29214, 2022-Ohio-3162, ¶ 38-39, *appeal not allowed*, 169 Ohio St.3d 1444, 2023-Ohio-554; *State v. Hurt*, 8th Dist. Cuyahoga No. 110732, 2022-Ohio-2039, ¶ 54-61, *appeal allowed*, 168 Ohio St.2d 1457, 2022-

Ohio-4201, *appeal dismissed as improvidently accepted*, 2023-Ohio-3013; *State v. Miree*, 8th Dist. Cuyahoga No. 110749, 2022-Ohio-3664, ¶ 69-72, *appeal allowed*, 169 Ohio St.3d 1430, 2023-Ohio-381; *State v. Duncan*, 8th Dist. Cuyahoga No. 110784, 2022-Ohio-3665, ¶ 25-28, *appeal allowed*, 169 Ohio St.3d 1430, 2023-Ohio-381, *stay lifted*, 171 Ohio St.3d 1464, 2023-Ohio-3697; *State v. Hughkeith*, 8th Dist. Cuyahoga No. 111647, 2023-Ohio-1217, ¶ 79, *appeal not allowed*, 170 Ohio St. 3d 1518, 2023-Ohio-2771;  *State v. Terry*, 9th Dist. Summit No. 30137, 2023-Ohio-2234, ¶ 15-30, *appeal accepted*, 171 Ohio St.3d 1475, 2023-Ohio-3789. Conversely, several appellate districts, including the Fifth and Eleventh District Courts of Appeals, have found that the stand-your-ground law applies in situations where the trial occurs after the effective date of the statute, regardless of when the underlying conduct occurred.  *See State v. Robinette*, 5th Dist. Stark No. 2021 CA 00124, 2023-Ohio-5, ¶ 51-52; *State v. Wagner*, 11th Dist. Lake No. 2021-Ohio-L-101, 2022-Ohio-4051, ¶ 27-28, *motion to certify allowed*, 169 Ohio St.3d 1466, 2023-Ohio-773, *and appeal allowed*, 169 Ohio St.3d 1467, 2023-Ohio-773.  The question of whether R.C. 2901.09, as amended to eliminate the duty to retreat for self-defense, applies to trial held after the effective date of the act, regardless of the date of the offense, is currently pending in the Supreme Court of Ohio.  *State v. Duncan*, 8th Dist. Cuyahoga No. 110784, 2022-Ohio-3665, ¶ 25-30, *appeal allowed*, 169 Ohio St.3d 1430, 2023-Ohio-381, *stay lifted,* 170 Ohio St.3d 1518, 2023-Ohio-2771.

{¶85} "A statute may not be applied retroactively unless the General Assembly expressly makes it retroactive." *State v. Brooks*, 170 Ohio St.3d 1, 2022-Ohio-2478, ¶ 10, citing *Hyle v. Porter*, 117 Ohio St.3d 165, 2008-Ohio-542, ¶ 9. "A statute is presumed to be prospective in its operation unless expressly made retrospective." R.C. 1.48; *Brooks* at ¶ 9. "To overcome the presumption that the statute applies prospectively, it must 'clearly proclaim its retroactive application.'" *Barker* at ¶ 38, quoting *Hyle* at ¶10. However, even "when the legislature has made a statute expressly retroactive, the determination whether that statute is unconstitutionally retroactive in violation of the Ohio Constitution depends on whether it is 'remedial' or 'substantive'—if the law is 'remedial,' then its retroactive application is constitutional; if the law is substantive, then its retroactive application is unconstitutional." *Brooks* at ¶ 10, citing *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 106-108 (1988), *superseded by statute on other grounds as stated in Hannah v. Dayton Power & Light Co.*, 82 Ohio St.3d 482, 484 (1998). "[L]aws affecting rights * * * are substantive in nature." *Id.*

{¶86} After reviewing the relevant appellate decisions that have addressed the issue, we are persuaded by the reasoning of the First, Second, Eighth, and Ninth appellate districts who have found that the amendments to R.C. 2901.09(B) are substantive in nature, and, accordingly, do not apply retroactively. *See, e.g., Parker* at ¶ 17; *Dagahson* at ¶ 19; *Terry* at ¶ 30. In addition to the sound reasoning adopted by these appellate districts, we note that the preamble to S.B. 175 specifically states

the purpose of the act is to "*expand* the locations at which a person has no duty to retreat before using force under both civil and criminal law." (Emphasis added.) We find this language to be an acknowledgement of the General Assembly's intent to create a substantive right through the amendment to R.C. 2901.09.

{¶87} Thus, we find that the trial court did not err by determining that Ohio's stand-your-ground law was not applicable to the instant case.

{¶88} Green's second assignment of error is overruled.

{¶89} In his third assignment of error, Green argues that, even under the former statute, the trial court erred by instructing the jury that Green had an on-going duty to retreat. Green contends that the testimony established that he attempted unsuccessfully to flee from from McGhee twice, and, accordingly, had no duty to retreat as long as he reasonably believed he was in imminent danger of bodily harm and deadly force was his only escape. Green also argues that because his mother, who he was allegedly protecting, was still inside the house, he did not have a duty to retreat.

{¶90} However, the State presented evidence at trial which indicates that Green stood outside of the residence at 126 S. Seffner Ave., with a firearm, and waited for McGhee to exit the house and then engaged him. Moreover, the State's evidence demonstrated that Green shot McGhee on a public sidewalk, which is outside the privilege of defending one's home.

{¶91} We likewise find Green's argument that he had no duty to retreat because his mother had no duty to retreat to be unavailing. Floyd testified that she succeeded in removing McGhee from her home. Although she was still in the house at the time of the shooting, she was in the process of trying to locate her shoes so that she could follow McGhee outside when he was shot by Green.

{¶92} Accordingly, we do not find that the trial court erred by instructing the jury that McGhee had an ongoing duty to retreat.

### Fourth Assignment of Error

**Ziair was deprived of his right to the effective assistance of counsel. Sixth and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution.**

{¶93} In his fourth assignment of error, Green argues that he was denied the effective assistance of counsel. Specifically, Green contends that his trial counsel was ineffective for failing to propose a "stand-your-ground" jury instruction despite the trial court's decision that such a jury instruction did not apply in the instant case. He also argues his trial counsel was ineffective for failing to ask Green about specific instances of the victim's prior violent conduct.

{¶94} "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 12th Dist. Clinton No. CA2019-05-010, 2020-Ohio-3072, ¶ 45. A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and

(2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

{¶95} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

{¶96} Turning to Green's argument, we focus entirely on the prejudice prong of the ineffective-assistance-of-counsel test. *See State v. Crawford*, 3d Dist. Henry No. 7-20-05, 2021-Ohio-547, ¶ 18 ("If the appellant does not establish one of [the

prongs of the test], the appellate court does not need to consider the facts of the case under the other prong of the test."). Green contends he received ineffective assistance of counsel due to his trial counsel's alleged failure to propose a stand-your-ground jury instruction despite the trial court's decision that the jury instruction did not apply in the instant case and for failing to ask Green about specific instances of McGhee's prior violent conduct. However, in his appellant's brief, Green concedes that those actions by his trial counsel would likely have been "futile." (Appellant's Brief at 31-32). *See Crawford* at ¶ 20, quoting *State v. Witherspoon*, 8th Dist. Cuyahoga No. 94475, 2011-Ohio-704, ¶ 33 ("'[T]he failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel and is not prejudicial.'"). We agree with counsel's assessment that such acts by trial counsel would have been futile. Furthermore, Green fails to argue specifically how his trial counsel's alleged shortcomings prejudiced him. Accordingly, we do not find that Green established that his trial counsel was ineffective.

{¶97} Green's fourth assignment of error is overruled.

### Fifth Assignment of Error

**Alternatively, the jury's verdict that Ziair did not act in defense of self or another was against the manifest weight of the evidence presented. Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Section 10 and 16, Ohio Constitution.**

{¶98} In his fifth assignment of error, Green argues that his convictions are against the manifest weight of the evidence. Specifically, Green contends that the greater weight of credible evidence established that he acted in self-defense.

-41-

*Standard for Manifest-Weight Review*

**{¶99}** In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

*Green's Convictions*

**{¶100}** Green was convicted of murder in violation of R.C. 2903.02(B), which provides that:

> No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C. 2903.03 or 2903.04].

-42-

**{¶101}** Here, Green was convicted of shooting and killing McGhee as the proximate result of committing or attempting to commit the offense of felonious assault  pursuant to R.C. 2903.11(A)(1) upon McGhee.

**{¶102}** R.C. 2903.11(A)(1), which codifies the offense of felonious assault, provides, in pertinent part that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *."  "A person acts knowingly, regardless of  purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."  R.C. 2901.22(B).

**{¶103}** Green attempted to assert a self-defense claim as to all allegations. R.C. 2901.05(B)(1), states as follows:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence.  If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶104}** "Under R.C. 2901.05(A) and (B)(1), a defendant claiming self-defense has the burden of production—that is, the burden of producing evidence that 'tends to support' his use of force in defending himself." *State v. Estelle*, 3d Dist. Allen No. 1-20-50, 2021-Ohio-2636, ¶ 18.  "Under the current version of R.C. 2901.05, if evidence is presented 'that tends to support' that the defendant used the force in self-defense, the *prosecution* must prove beyond a reasonable doubt that the

accused did not act in self-defense." (Emphasis sic.) *State v. Flory*, 3d Dist. Van Wert No. 15-20-02, 2020-Ohio-5136, ¶ 43. Accordingly, "the burden of *proof* for * * * self-defense has shifted to the state," but "the burden of *production* for * * * self-defense[ ] remains with the defendant." (Emphasis sic.) *State v. Messenger*, 10th Dist. Franklin No. 19AP-879, 2021-Ohio-2044, ¶ 44.

{¶105} "The elements of self-defense differ depending on whether the defendant used deadly or non-deadly force to defend himself." *State v. Eddy*, 3d Dist. Allen No. 1-22-17, 2022-Ohio-3965, ¶ 14. "The use of a gun constitutes the use of deadly force." *State v. Dale*, 2d Dist. Montgomery No. 2012 CA 20, 2013-Ohio-2229, ¶ 15.

{¶106} The elements of a self-defense claim are:

(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant has a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

{¶107} "[T]he State must 'disprove at least one of the elements of self-defense beyond a reasonable doubt.'" *State v. Passmore*, 3d Dist. Hancock No. 5-22-39, 2023-Ohio-3209, ¶ 29, quoting *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31. "The elements of self-defense are cumulative,

and a defendant's claim of self-defense fails if any one of the elements is not present." *State v. Ridley*, 1st Dist. Hamilton No. C-210458, 2022-Ohio-2561, ¶ 15.

*Analysis: Manifest Weight of the Evidence*

{¶108} In support of his argument that his murder conviction is against the manifest weight of the evidence, Green argues the State's eyewitness, Mosley, "was biased" and "offered inconsistent and unreliable testimony." (Appellant's Brief at 32-33). On the other hand, Green argues that "he testified consistently and without contradiction [that] he had a bona fide belief that he and his mother were in imminent danger of death or serious bodily harm." (*Id.* at 33). However, upon review of the record, we do not conclude that the jury's witness-credibility determinations were unreasonable in light of the evidence presented at trial.

{¶109} At trial, Mosley, McGhee's fiancée at the time of his death, testified that on January 18, 2021, she spent the day with McGhee in Columbus. (Feb. 1-10, 2022 Tr. at 748-749). After they returned to Marion, they visited a friend's house to watch a sporting game and relax. (*Id.* at 749-750). Later in the night, McGhee drove himself and Mosley to Floyd's house. (*Id.* at 751-752). When they arrived at the house, McGhee entered through the unlocked front door while Mosley remained in the vehicle. (*Id.* at 753-754). McGhee left the keys in the ignition and the driver-side vehicle door open. (*Id.* at 758, 789); (State's Ex. 36).

{¶110} Shortly thereafter, Mosley observed Green exit the house through the side door. (Feb. 1-10, 2022 Tr. at 755). According to Mosley, Green walked up to

the driver's-side door and told Mosley, "You all got four minutes to pull off, or I'm going to shoot * * * that bitch up." (*Id.* at 759). Mosley testified that when Green referenced "shooting it up" that he held up a gun for Mosley to see. (*Id.* at 760). Then, Green returned inside the house. (*Id.* at 761).

{¶111} Mosley testified that Green's actions prompted her to get out of the vehicle and walk to the front of the house to retrieve McGhee. (*Id.* at 760). When Mosley approached the front door, the front door was open but the screen door was closed, and Green was pacing back and forth at the bottom of the stairs holding the gun. (*Id.* at 761). Mosley claims that when she reached for the screen door to enter the house, Green said, "You ain't coming in here, because all this is because of you." (*Id.* at 763). Mosley stated this interaction prompted her to walk back down the front steps, return to the car, and try to locate her phone. (*Id.*). As Mosley searched for her phone that had fallen between the vehicle's seats due to her shaking hands, Green again approached the vehicle, pointed the gun at her and told her that he should shoot her because this was all because of her. (*Id.* at 766-767). Then, Green moved to the driver's-side door, pointed the gun at her again, and said, "I should shoot you. I should kill your ass, because all of this is because of you." (*Id.* at 767). Then, Mosley recalled that Green went toward the side of the house near Center Street. (*Id.* at 768).

{¶112} Shortly thereafter, Mosley looked up from praying and saw McGhee and Floyd coming out the front door of the house. (*Id.*). At the time Mosley looked

up, Floyd was on the porch and McGhee was midway down the front steps. (*Id.* at 768-769). Mosley stated that McGhee looked like he was going to walk toward her, but then he took a step toward the sidewalk and pivoted toward Center Street where Green was standing. (*Id.* at 769). Then, Mosley heard McGhee say, "But you a child." (*Id.*). Mosley looked and saw Green standing with a gun pointed at McGhee. (*Id.*). Mosley did not hear Green reply. (*Id.*). Then she heard two shots. (*Id.*). Upon hearing the shots, Mosley opened the car door and lay down in the snow. (*Id.*). After she hit the ground, Mosley heard McGhee say, "Well, you think I'm scared of you because you got a gun?" (*Id.* at 770). Then, Mosley testified that she heard five to six more shots. (*Id.*). When Mosley looked back up, she saw McGhee pivot back toward Mosley, grab his chest, and fall to the ground. (*Id.*). She observed Green running toward Center Street. (*Id.* at 773). Shortly thereafter, Mosley saw Floyd run out of the house and toward McGhee. (*Id.* at 770-771). Then, Mosley located a phone in the vehicle and called the police. (*Id.* at 771-772).

{¶113} Mosley admitted that, initially, she told the police that she did not see who shot McGhee. (*Id.* at 774-775). However, shortly after Mosley left the house that evening, she called the police and told them that she saw who shot McGhee and was willing to give the police a statement regarding what she had seen. (*Id.* at 776-777). Mosley testified that the reason she initially did not tell the officers who shot McGhee was that Green was on the run and Mosley was concerned for the safety of her children. (*Id.* at 775-776). Mosley further stated that she had been with McGhee

the entire day and did not see him with a weapon at any time throughout the day. (*Id.* at 778).

{¶114} On cross-examination, Mosley, who was incarcerated at the time of the trial, testified she has also been convicted of several crimes in the past including several counts of theft and a count of obstructing official business. (Feb. 1-10, 2022 Tr. at 747-748, 797-801). Mosley also specified to McGhee's path of travel after leaving the house. (*Id.* at 813). Mosley stated that if McGhee had turned left at the bottom of the front steps, it would have been a direct path to his vehicle. (*Id.* at 813-814). She stated that when McGhee walked down the stairs, he pivoted left toward the car, then, when McGhee noticed Green, he turned toward Green. (*Id.* at 814). However, he never took steps from that point. (*Id.* at 814-815).

{¶115} Floyd, Green's mother, was called as a court's witness at the request of the State. (*Id.* at 835). Floyd testified that on January 18, 2021, she and McGhee had been exchanging messages throughout the day, and that there was some discussion of Floyd sending McGhee a sexual video accompanying a text that said, "I have something special for you. Good night." (*Id.* at 836-837). Floyd testified that McGhee arrived at her home at approximately 10:35 p.m. and that he was lying shot on the sidewalk by 10:40 p.m. (*Id.* at 837).

{¶116} Floyd stated that when McGhee arrived at the home, he came up to her room, where she was lying in bed, and pulled the covers off her. (Feb. 1-10, 2022 Tr. at 841). Floyd stated that she and McGhee argued, and at some point,

McGhee left to go outside. (*Id.* at 854). Floyd stated that she wanted to follow McGhee out of the house, but she was unable to locate her shoes. (*Id.*). She was on the porch attempting to locate her shoes when she heard approximately three to four gunshots. (*Id.* at 855). She looked up and saw McGhee fall to the ground and Green run away from the scene. (*Id.*). Floyd testified that she ran out of the house to McGhee's side. (*Id.*).

{¶117} Floyd stated she initially told officers she did not know what happened, when in fact, it was her son, Green, who shot McGhee. (*Id.* at 837-838). However, a little more than an hour after the shooting, she admitted to one of the officers at the scene that Green was the one who shot McGhee. (*Id.* at 857).

{¶118} Floyd stated that she and McGhee were married in 2009 but had ended their relationship by October 2020 and McGhee was no longer living at her home at 126 S. Seffner Ave. on January 18, 2021. (Feb. 1-10, 2022 Tr. at 862). Floyd confirmed that, although they were not currently together, she and McGhee maintained communication and continued having an intimate relationship. (*Id.* at 863-864).

{¶119} On cross-examination, Floyd provided more detail regarding the altercation she had with McGhee on January 18, 2021. She stated Floyd pulled the covers off her and she got up and flipped on the lights. (*Id.* at 869, 871). Then, she and Floyd began to argue. (*Id.* at 872). At some point, McGhee choked Floyd up against the refrigerator in her room. (*Id.* at 872, 874, 878); (Defendant's Ex. A).

Floyd stated she was fearful when McGhee grabbed her by the throat and slammed her against the wall. (Feb. 1-10, 2022 Tr. at 879).

{¶120} Floyd recalled that Green came upstairs and told McGhee, "[H]e better not put his hands on his momma no more." (*Id.*). Floyd stated that she told Green, "I'll take care of it." (*Id.*). She stated she was in fear for Green and wanted to get Green out of the confrontation between her and McGhee. (*Id.*). According to Floyd, Green then went downstairs. (*Id.*).

{¶121} Floyd and Green continued their argument in Floyd's bedroom, and Floyd instructed McGhee to "get out" of the house. (Feb. 1-10, 2022 Tr. at 880). McGhee went down the stairs with Floyd following him. (*Id.*). According to Floyd, McGhee saw Green in the bathroom off the kitchen and went toward Green. (*Id.*). She stated that McGhee asked Green, "What you gonna do, bitch?" (*Id.* at 884-885). However, Floyd jumped in between McGhee and Green. (*Id.* at 885). Floyd stated that she was in fear for her son because McGhee has a reputation for violence. (*Id.* at 885-886). Floyd recalled that after she jumped between McGhee and Green, Green exited the house through the side door off the kitchen. (*Id.* at 886-887).

{¶122} Floyd stated that she continued to argue with McGhee and told him to "[l]eave" and "[g]et out." (*Id.* at 887). She stated that McGhee did not yell back at her. (*Id.*). However, McGhee pinned Floyd against the staircase by her throat. (*Id.* at 887-888). In response, Floyd grabbed McGhee's shirt and kicked him in the midsection to get him off her. (*Id.* at 891). Floyd stated that the choking lasted for

approximately two to three seconds. (*Id.*). Then, Floyd stated she shoved McGhee out the front door. (*Id.* at 892).

{¶123} Floyd recalled that when McGhee reached the bottom of the front porch steps, he immediately turned right. (Feb. 1-10, 2022 Tr. at 893). Floyd stated she did not hear any of the words McGhee said to Green. (*Id.* at 894). Floyd testified she has never known McGhee to carry a gun. (*Id.* at 898).

{¶124} Floyd admitted she initially told law enforcement officers that McGhee did not hit her at all on January 18, 2021. (*Id.* at 896, 901). However, she later stated that she and McGhee entered into a physical altercation that night. (*Id.* at 897). She stated the reason she initially denied being hit by McGhee was that in the immediate aftermath of the altercation she was "frantic" and "not thinking straight." (*Id.* at 896). Defendant's Exhibits K and L, photographs which depict Floyd on the evening of January 18, 2021 were introduced at trial. (*Id.* at 895-896); (Defendant's Exs. K, L). The photographs depict Floyd with a small mark on her lip. (Feb. 1-10, 2022 Tr. at 896); (Defendant's Exs. K, L).

{¶125} Green also took the stand in his own defense. (Feb. 1-10, 2022 Tr. at 1246). He testified that on January 18, 2021, he was at his home at 126 S. Seffner Ave. when McGhee entered the house without knocking. (*Id.* at 1248). According to Green, McGhee was acting "[a]ggressive" and yelled at Green asking him where his mother was. (*Id.* at 1248-1249). McGhee then went upstairs and Green remained in the living room despite knowing that his mother was upstairs in her

bedroom. (*Id.* at 1249). Green stated that he did not try to stop McGhee from coming to Floyd's room because he knew they were just going to argue because they "do it all the time." (*Id.*).

{¶126} According to Green, he eventually went to the bottom of the stairs to monitor if things escalated further than arguing because McGhee "beat [his] mother before." (*Id.* at 1249-1250). While he waited at the bottom of the stairs, he heard his mother screaming and loud banging against the walls which prompted him to go upstairs to his mother's room. (*Id.* at 1250). Green testified that when he entered the room, he witnessed McGhee choking his mom. (*Id.* at 1250-1251). Green stated he told McGhee to keep his hands off Floyd and asked McGhee to leave three times. (*Id.*).

{¶127} Green stated that his actions in defense of his mom prompted McGhee to turn his attention to him. (Feb. 1-10, 2022 Tr. at 1251) Green testified that he ran downstairs and locked himself in the bathroom off the kitchen. (*Id.*). According to Green, he ran because McGhee "has always been violent" and he was afraid of McGhee. (*Id.* at 1251-1252). McGhee allegedly followed Green downstairs and started kicking and banging on the bathroom door in an apparent effort to enter the bathroom. (*Id.* at 1252). Green stated that when the banging stopped, he opened the door to see where McGhee was located. (*Id.*).

{¶128} When he did not see McGhee near the bathroom door, he exited the bathroom into the kitchen, where he saw McGhee and Floyd arguing. (*Id.* at 1252-

1253). Then, McGhee approached Green, grabbed him by his shirt, and threw him against the wall and onto the floor. (*Id.* at 1253). Green stated that, at this point, Floyd intervened and got in between Green and McGhee. (*Id.* at 1254). According to Green, Floyd grabbed an air freshener and sprayed McGhee in the face with it, causing McGhee to fall. (*Id.*).

{¶129} Green testified that when McGhee fell to the ground, "[t]he gun came out of his possession." (Feb. 1-10, 2022 Tr. at 1254). Green stated he picked up the gun and ran outside. (*Id.* at 1255). When he got outside, Green stated that he approached the front of McGhee's vehicle and asked Mosley for help, which she did not render. (*Id.* at 1255-1256). He denied threatening Mosley or showing her the gun. (*Id.* at 1257). Then, he stated that he stood by the north side of the front steps, towards Center Street. (*Id.* at 1256). Green explained that he did not run because he "couldn't leave [Floyd] in danger." (*Id.* at 1257). Green expounded that he did not know what was happening to Floyd inside the house. (*Id.*).

{¶130} According to Green, McGhee exited the house, came down the stairs, and "started coming after [Green]." (*Id.* at 1257-1258). Green stated that when McGhee came down the stairs, based on McGhee's body language, Green believed that McGhee was still "angry and mad." (*Id.* at 1258). Green stated that after McGhee turned right, McGhee "started charging at [him]." (*Id.*). Green then fired two "warning shots" in the air to warn McGhee that if he continued to threaten him, Green had a right to defend himself. (*Id.* at 1258-1259). McGhee then said, "You

think I'm scared because you have a gun?" (*Id.* at 1259). Green testified that he did not feel that he could run at this point, because he did not want to leave his mother, who was still in the house, in danger. (*Id.*).

{¶131} Green testified that after Green fired the warning shots, McGhee kept coming after him. (Feb. 1-10, 2022 Tr. at 1259). So, he pointed the gun at McGhee, pulled the trigger, and fired two shots toward McGhee. (*Id.*). However, Green denied that he intended for the shots to hit McGhee. (*Id.* at 1259-1260). He further denied that he intended to kill McGhee. (*Id.* at 1260).

{¶132} After firing the second round of shots, Green observed McGhee fall to the ground. (*Id.*). Green stated that he then dropped the gun, left it at the scene, and ran toward Center Street. (*Id.*). He spent the next several days on the run before turning himself in. (*Id.*).

{¶133} On cross-examination, Green clarified he was in fear of his safety and the safety of his mother. (Feb. 1-10, 2022 Tr. at 1262-1263). Green stated he knew he shot McGhee, yet he still ran away. (*Id.* at 1264). He denied he knew that he wounded McGhee gravely; rather, he thought maybe he "just nicked him." (*Id.*). Further, he admitted that although he claimed to fear for his mother's safety, he did not return to the house to check on her well-being after he shot McGhee. (*Id.*). Rather, he ran away. (*Id.*).

{¶134} Green explained that when he approached Mosley for help, he did not yell "help" at any time. (*Id.* at 1265). Nor did Green attempt to elicit help from

any of the neighbors or the fire station that he ran past during his flight from the scene. (*Id.* at 1265-1267).

{¶135} Furthermore, Green stated that when McGhee left the house and came down the stairs, he knew McGhee was unarmed. (Feb. 1-10, 2022 Tr. at 1270). Green admitted that before McGhee did anything rather than walk down the steps, Green had decided to shoot off some warning shots. (*Id.*). However, he denied that the purpose of the warning shots was to intimidate McGhee. (*Id.*).

{¶136} Green argues the jury's verdict is against the weight of the evidence because Green was allegedly a more credible witness than Mosley. However, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. "'Although we review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily a determination for the trier of fact.'" *State v. Cox*, 3d Dist. Auglaize No. 2-21-15, 2022-Ohio-571, ¶ 20, quoting *State v. Banks*, 8th Dist. Cuyahoga No. 96535, 2011-Ohio-5671, ¶ 13, citing *DeHass*, 10 Ohio St.2d, at paragraph one of the syllabus. "'The trier of fact is best able "to view the witnesses and observe their demeanor, gestures[,] and voice inflections, and use these observations in weighing the credibility of the proferred testimony."'" *State v. Brentley,* 3d Dist. Allen Nos. 1-22-61 and 1-22-60, 2023-Ohio-2530 ¶ 33, quoting *Banks* at ¶ 13, quoting *State v. Wilson*, 113 Ohio St.3d 382,

2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81 (1984).

{¶137} Additionally, the evidence presented could have led a reasonable jury to conclude that Green's decision to shoot McGhee was not reasonable and was not based on an honest belief in the need for self-defense. Specifically, the testimony presented at trial could have led the jury to conclude that Green left the house, threatened to kill Mosley and McGhee, and then chose to reengage McGhee as McGhee attempted to leave 126 S. Seffner Ave.

{¶138} Furthermore, Green's testimony was, at many points, inconsistent with the testimony of Floyd, Mosley, and other witnesses. For instance, Green contends McGhee brought the gun to the house and dropped it in the kitchen. However, Mosley, who spent the day with McGhee, stated that that he did not have a weapon of any kind on his person. Furthermore, Floyd stated that she had never known McGhee to carry a firearm. Moreover, Green's testimony that he left the gun at the scene, on the sidewalk, is not consistent with the testimony of the other witnesses or the physical evidence left at the scene. Despite Green's insistence that he left the gun on the sidewalk, it was never recovered, in spite of multiple law enforcement officers combing the property for physical evidence, including bullets and bullet casings.

{¶139} Green also denied shooting the gun more than four times. However, this testimony is inconsistent with the testimony of multiple neighbors and witnesses

who testified to hearing approximately six to eight gunshots. Furthermore, surveillance video from a neighbor's home was introduced as State's Exhibit 87 and was played for the jury. (Feb. 1-10, 2022 Tr. at 445-448). In the video, eight popping sounds were heard. (*Id.* at 448); (State's Ex. 87).

{¶140} Accordingly, after reviewing the evidence, we find that a reasonable jury could have found that Green did not act in self-defense.

{¶141} Green's fifth assignment of error is overruled.

### Sixth Assignment of Error

**Ziair's statutory and due process rights were violated when he was criminally indicted and convicted on a charge and specifications that were never filed in or transferred from the Marion County Juvenile Court. R.C. 2152.12; Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Section 16, Ohio Constitution.**

{¶142} In his sixth assignment of error, Green argues that his statutory and due process rights were violated when he was indicted and convicted on a murder charge and specifications in Marion County Common Pleas Court that were not filed in or transferred from the Marion County Juvenile Court.

{¶143} On January 19, 2021, Green, then 17 years old, was charged in a two-count complaint in the family division of the Marion County Court of Common Pleas ("the juvenile court"). Green was charged with Count One of murder in violation of R.C. 2903.02(A) ("purposeful murder") and Count Two of aggravated murder in violation of R.C. 2903.01(A), both unclassified felonies if committed by an adult.

-57-

{¶144} The State sought transfer of Green's case from the juvenile court to the general division of the common pleas court. On February 11, 2021, a probable cause hearing was held and the juvenile court judge found that the State had established probable cause to believe that Green had committed the acts related to both counts. The trial court found that bindover was mandatory pursuant to R.C. 2152.12. Accordingly, the matter was transferred to the Marion County Common Pleas Court, General Division ("the adult court").

{¶145} On February 24, 2021, the Marion County Grand Jury indicted Green on three counts: Count One of murder in violation of RC. 2903.02(A), an unclassified felony; Count Two of murder in violation of R.C. 2903.02(B) ("felony murder"), an unclassified felony; and Count Three of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony. Additionally, each of the counts contained a three-year firearm specification pursuant to R.C. 2941.145 and R.C. 2929.14(D). Relative hereto, Counts Two and Three, and the accompanying firearm specifications, were not among the charges in the complaint filed in the juvenile court.

{¶146} Green argues that the trial court lacked subject-matter jurisdiction over Counts Two and Three because they were not charged in the complaint filed in juvenile court, and accordingly, the juvenile court did not issue findings of probable cause for those offenses. Green argues that because the juvenile court never found probable cause for the offenses of felony murder and felonious assault,

the juvenile court never transferred, and the adult court never acquired, subject-matter jurisdiction over those offenses.  Notably, those charges and their attendant specifications were the only charges that resulted in convictions.

{¶147} In support of his argument, Green relies primarily on the Supreme Court of Ohio's decision in *State v. Smith*, 167 Ohio St.3d 423, 2022-Ohio-274.  In that decision, the Supreme Court of Ohio held that "[a] finding of probable cause is a jurisdictional prerequisite under R.C. 2152.12 to transferring a child to adult court for prosecution for an *act* charged."  (Emphasis added.)  *Smith* at ¶ 44.  In *Smith*, the State brought criminal charges against a juvenile in adult court for acts that the juvenile court determined were unsupported by probable cause in addition to acts that the juvenile court found were supported by probable cause.  *Id.* at ¶ 11-12.  The Supreme Court of Ohio held that the trial court lacked subject-matter jurisdiction to convict Smith, a juvenile offender, "for any acts charged for which no probable cause has been found by a juvenile court."  *Id.* at ¶ 42.  Accordingly, the Supreme Court held that the adult court lacked subject-matter jurisdiction over the counts and specifications that the trial court determined were not supported by probable cause.  Specifically, the Supreme Court of Ohio held that "because the juvenile court found that the acts related to those counts and specifications were not supported by probable cause and thus the juvenile court could not have made an amenability determination with regard to those acts."  *Id.* at ¶ 43.  Therefore, the Supreme Court of Ohio concluded there was a "jurisdictional defect in the bindover process."  *Id.*

**{¶148}** However, *Smith* is distinguishable from the instant case. Here, the juvenile court made a finding of probable cause as to all the counts charged in and bound over from the juvenile court (purposeful murder and aggravated murder). By contrast, in *Smith,* the juvenile court specifically found no probable cause for several counts that were subsequently charged in adult court. *See State v. Strickland*, 10th Dist. Franklin No. 22AP-329, 2023-Ohio-1252, ¶ 27.

**{¶149}** Significantly, subsequent to the decision in *Smith* and the time for filing of briefs in the instant case, the Supreme Court of Ohio decided *State v. Burns*, 170 Ohio St.3d 57, 2022-Ohio-4606, in which the issue was "whether the state must prove in juvenile court that there is probable cause to believe that a juvenile committed every act charged before the juvenile may be indicted for those acts in adult court." *Burns* at ¶ 1. The Supreme Court held that "an adult court is not necessarily limited to considering only the specific acts bound over from the juvenile court." *Id.* at ¶ 12. The Court explained as follows:

> We acknowledge that, generally, a grand jury is empowered to return an indictment on any charges supported by the facts submitted to it. *See State v. Adams*, 69 Ohio St.2d 120, 431 N.E.2d 326 (1982), paragraph two of the syllabus, *superseded by statute on other grounds as stated in State v. D.W*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894. But a grand jury may not consider additional charges arising from a different course of conduct or events that have not been properly bound over by the juvenile court. *State v. Weaver*, 6th Dist. Lucas No. L-18-1078, 2019-Ohio-2477, 2019 WL 2564126, ¶ 14 (citing cases from several Ohio appellate districts). This means that a case transferred from a juvenile court may result in new indicted charges in the adult court when the new charges are rooted in the acts that were the subject of the juvenile complaint but were not

specifically named in the individual acts transferred. *Id.*; *Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, 194 N.E.3d 297, at ¶ 35.

*Id.* at ¶ 13.

**{¶150}** The Supreme Court then affirmed the defendant's convictions on Counts 45 and 46, which were not charged in the juvenile-court complaint, but were charged in the grand jury indictment. *Id.* The Court reasoned that although those specific charges were not filed in the juvenile complaint, they were "based on conduct that occurred on or about February 7, 2018—conduct that was in the juvenile complaint against Burns." *Id.*

**{¶151}** Likewise, in the instant case, Counts Two and Three of the indictment, and their accompanying firearm specifications, are based on conduct that occurred on January 18, 2021, conduct that was in the juvenile complaint against Green. Accordingly, we find that the adult court had subject-matter jurisdiction with respect to those counts.

**{¶152}** Green's sixth assignment of error is overruled.

**Seventh Assignment of Error**

**Ziair was deprived of his constitutional rights because Ohio's mandatory transfer statutes violate due process guarantees. Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution.**

**{¶153}** In his seventh assignment of error, Green argues that Ohio's mandatory transfer statutes violate juvenile offenders' due process rights because

the mandatory-transfer statutes do not permit an individualized assessment of the juvenile.

{¶154} In support of his argument, Green relies on the Supreme Court of Ohio's decision in *State v. Aalim*, 150 Ohio St.3d 463, 2016-Ohio-8278 ("*Aalim I*"), which held that "the mandatory transfer of juveniles to a general division of a common pleas court violates juveniles' right to due process" because it does not require "individual consideration at amenability hearings before being transferred from the protections of juvenile court to adult court upon a finding of probable cause for certain offenses." *Aalim I* at ¶ 24, 31. However, the Supreme Court of Ohio granted reconsideration, and in *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956 ("*Aalim II*"), vacated its decision in *Aalim I* and held that the mandatory bindover of certain juveniles to adult court pursuant to R.C. 2152.10(A)(2)(b) and 2151.12(A)(1)(b) does not violate the juvenile offender's due process or equal protection rights. *Aalim II* at ¶ 4, 38.

{¶155} Specifically, the *Aalim II* Court determined that Aalim's mandatory bindover "satisfied the requirements of 'fundamental fairness'" required by the Ohio and federal due process clauses because Aalim had a hearing before a juvenile-court judge to determine his age at the time of the offenses and that probable cause existed to believe that Aalim committed the conduct alleged in the juvenile complaint before the case was transferred from juvenile court to adult court. *Aalim*

*II* at ¶ 27. The Supreme Court noted that Aalim was represented by counsel at this hearing and had a parent present. *Id.*

{¶156} Here, like in *Aalim II*, Green was represented by counsel at a hearing in front of the juvenile court where that court determined that the State met its burden of demonstrating there was probable cause that Green committed the acts alleged in the juvenile-court complaint. It was only following this hearing that the matter was transferred from the juvenile court to the adult court. Accordingly, we find that Green has failed to show that his mandatory bindover violated his right to due process or that Ohio's mandatory-bindover statutes facially violate the right to due process. *See Aalim II* at ¶ 27.

{¶157} Green's seventh assignment of error is overruled.

**Eighth Assignment of Error**

**The cumulative effect of the errors in this case deprived Ziair of his right to a fair trial. Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution.**

{¶158} In his eighth assignment of error, Green summarily argues that he was deprived of a fair trial due to the cumulative effect of the alleged errors outlined in his other seven assignments of error. We disagree.

{¶159} Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-

Ohio-52, ¶ 83. "To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." *In re J.M.*, 3d Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36. Here, we have not found that the trial court committed any errors that were not harmless, let alone, multiple errors. Therefore, the cumulative-error doctrine does not apply. *See State v. Jamison*, 9th Dist. Summit No. 27664, 2016-Ohio-5122, ¶ 40, *abrogated on other grounds*, *State v. Haynes*, 171 Ohio St.3d 508, 2022-Ohio-4473 ("If there [are] not multiple errors, * * * the cumulative error doctrine does not apply."); *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 104, citing *State v. Bertuzzi*, 3d Dist. Marion No. 9-13-12, 2014-Ohio-5093, ¶ 110.

**{¶160}** Green's eighth assignment of error is overruled.

*Conclusion*

**{¶161}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Marion County Court of Common Pleas.

*Judgment Affirmed*

**WILLAMOWSKI and WALDICK, J.J., concur.**

**/eks**